64 F.3d 1276
 95 Cal. Daily Op. Serv. 6644, 95 Daily Journal
D.A.R. 11,410
Jeffrey BRADLEY, Individually and on behalf of all other
similarly situated individuals, Plaintiff-Appellee,
v.
Frank HALL, Director, Oregon Department of Corrections,
Defendant-Appellant.
 No. 94-35844.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 11, 1995.
Decided Aug. 23, 1995.
 
 Kaye Sunderland, Asst. Atty. Gen., Salem, OR, for defendant-appellant.
 Spencer M. Neal, Ginsburg, Neal & Lasage, Portland, OR, for plaintiff-appellee.
 Appeal from the United States District Court for the District of Oregon.
 Before: GOODWIN and HUG, Circuit Judges, and SCHWARZER*, District Judge.
 GOODWIN, Circuit Judge:
 
 
 1
 Jeff Bradley, an Oregon prisoner, sued Frank Hall, the director of the Oregon Department of Corrections ("ODOC") under 42 U.S.C. Sec. 1983 to challenge the constitutional validity of prison regulations prohibiting the use of "hostile, sexual, abusive or threatening" language, Or.Admin.R. 291-105-015(2)(f) and (g). Bradley contended that subjecting him to discipline under these rules for his use of disrespectful language in a written prison complaint form violated his right to petition for redress of grievances. The district court denied the director's motion for summary judgment, granted Bradley's cross-motion for summary judgment, and enjoined the ODOC from punishing Bradley for the wording of his written grievance under any of the ODOC disrespect rules, except to the extent that his grievance may include criminal threats. The district court found that the challenged regulations, though facially valid, were unconstitutional as applied to the contents of prisoner grievances. The director appeals and we affirm.
 
 BACKGROUND
 
 2
 When a prison guard failed to retrieve Bradley from his room for his law library call-out as the guard promised, Bradley submitted a written grievance to the guard's superior in accord with the formal grievance procedures established by the ODOC. After receiving a copy of Bradley's complaint, the accused guard filed a disciplinary report against Bradley, charging him with violating Or.Admin.R. 291-105-015(2)(f) (Disrespect II). The guard cited Bradley for the following language in his grievance:
 
 
 3
 Her [the guard's] actions shows her misuse of her authority and her psychological disorder needs attention. Then you wonder why things happen like that guard getting beat down? I suggest you talk to this woman and have her act professionally instead of like a child. [sic]
 
 
 4
 Bradley was found guilty of, and punished for, the lesser offense of violating Or.Admin.R. 291-105-015(2)(g) (Disrespect III).
 
 
 5
 The Oregon rules prohibiting the use of disrespectful language by prisoners, Or.Admin.R. 291-105-015(2)(e), (f), and (g) respectively, provide:
 
 
 6
 Disrespect I: An inmate commits Disrespect I if he/she directs hostile, sexual, abusive or threatening language or gestures, verbal or written, towards or about another person involving a physical threat to the other person;
 
 
 7
 Disrespect II: An inmate commits Disrespect II if he/she directs hostile, sexual, abusive or threatening language or gestures, verbal or written, towards or about another person involving a threat to the safety security and orderly operation of the facility (including, but not limited to, when other inmates or employees are present, or in a location such as a dining hall or recreation yard);
 
 
 8
 Disrespect III (minor violation): An inmate commits Disrespect III when he/she directs hostile, sexual, abusive or threatening language or gestures, verbal or written toward another person.
 
 
 9
 Bradley brought this civil rights action to challenge the validity of the disrespect rules as applied to statements made in a written grievance, on the ground that fear of discipline impermissibly burdened his constitutional right of access to the courts and right to petition the government for redress of his grievances.[1] The director argued that the disrespect rules do not hinder a prisoner from filing a grievance or suit, but merely from using inappropriate language within the grievance itself. The district court ruled that "[p]unishing an inmate for the content of his grievance rather than for the act of filing the grievance is a distinction without a difference." The district court concluded, "Prisoners should be allowed to file grievances within the prison system without fear of being sanctioned for an unhappy choice of words, except to the extent that [the words include] criminal threats." The court granted summary judgment to Bradley and enjoined prison officials from applying the disrespect rules to the language within Bradley's written grievances.
 
 DISCUSSION
 
 10
 1. The Prisoner's Rights Burdened by the Disrespect Rules
 
 
 11
 It has long been "established beyond doubt that prisoners have a constitutional right of access to the courts." Bounds v. Smith, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977). A prisoner's right to meaningful access to the courts, along with his broader right to petition the government for a redress of his grievances under the First Amendment, precludes prison authorities from penalizing a prisoner for exercising those rights. In some instances, prison authorities must even take affirmative steps to help prisoners exercise their rights. Id. at 821-832, 97 S.Ct. at 1494-1500; Casey v. Lewis, 4 F.3d 1516, 1520 (9th Cir.1993).
 
 
 12
 The right of meaningful access to the courts extends to established prison grievance procedures. Valandingham v. Bojorquez, 866 F.2d 1135, 1138 (9th Cir.1989). See also Hines v. Gomez, 853 F.Supp. 329, 331-332 (N.D.Cal.1994) and cases cited therein. The "government" to which the First Amendment guarantees a right of redress of grievances includes the prison authorities, as it includes other administrative arms and units of government. Soranno's Gasco, Inc. v. Morgan, 874 F.2d 1310, 1314 (9th Cir.1989). Moreover, in some cases a prisoner may be required to exhaust the established prisoner grievance procedure before securing relief in federal court. See 42 U.S.C. Sec. 1997 et seq. In those cases, a prisoner's fundamental right of access to the courts hinges on his ability to access the prison grievance system.
 
 
 13
 We are not persuaded by the director's argument that punishing a prisoner for the content of his grievance does not burden his ability to file a grievance. From the prisoner's point of view, the chilling effect is the same. Whether the content of the grievance or the act of filing the grievance is deemed to be the actus reus of the offense, the prisoner risks punishment for exercising the right to complain. Without question, the application of the ODOC disrespect regulations to Bradley's written grievance impacts his constitutionally protected rights under the Fourteenth and First Amendments.
 
 2. The Turner Test and Analysis
 
 14
 Prison regulations that infringe a prisoner's constitutional right are valid so long as they are "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89, 107 S.Ct. 2254, 2261-62, 96 L.Ed.2d 64 (1987); Casey v. Lewis, 4 F.3d at 1520. The Supreme Court has identified four factors to consider when determining the reasonableness of a prison rule: 1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; 2) "whether there are alternative means of exercising the right that remain open to prison inmates"; 3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally"; and 4) the "absence of ready alternatives" or, in other words, whether the rule at issue is an "exaggerated response to prison concerns." Turner v. Safley, 482 U.S. at 89-90, 107 S.Ct. at 2261-62 (internal quotations omitted).
 
 
 15
 The record highlights several legitimate penological interests furthered by the ODOC disrespect regulations. According to expert testimony and the director's brief, the disrespect rules "help prison staff display the high degree of self-control necessary in the correctional profession," by heading off situations in which inmates may bait or goad guards into unprofessional conduct. The record evidence shows that the disrespect rules were adopted to aid in "prison control through encouragement and enforcement of respect by inmates toward staff and other inmates, and rehabilitation of inmates through insistence on their use of socially acceptable ways of solving their problems." There is no question that these are legitimate penological interests and the disrespect rules further each of these interests.
 
 
 16
 Stressing the deference we owe prison officials, the director argues that, at a minimum, the articulation of these legitimate penological interests served by the rules and the evidence that the rules, in fact, were adopted to serve those interests makes summary judgment for Bradley inappropriate.
 
 
 17
 The Turner case makes clear that it is not our job to second guess the details of prison management. "[P]rison administrators ..., and not the courts, are to make the difficult judgments concerning institutional operations." Turner v. Safley, 482 U.S. at 89, 107 S.Ct. at 2261-62. We have also said that for a prison regulation to pass muster "[p]rison officials need merely put forward a legitimate government interest, and provide some evidence that the interest put forward is the actual reason for the regulation." Casey v. Lewis, 4 F.3d at 1520-21 (internal quotations and citations omitted). However, this deferential standard, which the director has met, does not necessarily tell the full story of the analysis required under Turner, but only describes the first, necessary step.
 
 
 18
 Where appropriate, we must also look to see if the prison rule is an "exaggerated response to prison concerns." Turner v. Safley, 482 U.S. at 89-90, 107 S.Ct. at 2261-62. In order to determine whether a rule, even if rationally related to a legitimate interest, is an exaggerated response, we must balance the importance of the prisoner's infringed right against the importance of the penological interest served by the rule. We must also examine the strength of the logical nexus between the penological purpose served and restriction of the prisoner's rights.
 
 
 19
 A prison rule requiring all inmates to shower on Tuesdays would serve the legitimate penological interest of maintaining hygienic conditions. However, it is unlikely that this Court would permit prison officials to keep a prisoner from attending a court date that happened to fall on a Tuesday. The importance of the prisoner's right to attend his own court date would outweigh the legitimate, though less pressing, prison interest in a clean, fragrant prison atmosphere. Such a rule would be an exaggerated response. Thus, our analysis does not necessarily end at the recognition that the prison rule was adopted to serve, and actually does serve, a legitimate penological interest. "[D]eference does not mean abdication." Walker v. Sumner, 917 F.2d 382, 385 (9th Cir.1990).
 
 
 20
 A prisoner's constitutional right of meaningful access to the courts, which underlies the issue here, is fundamental. Bounds v. Smith, 430 U.S. at 828, 97 S.Ct. at 1498. The reality and substance of any of a prisoner's protected rights are only as strong as his ability to seek relief from the courts or otherwise to petition the government for redress of the deprivation of his rights. Here, the burden the challenged disrespect rules places on this important right is substantial.
 
 
 21
 Bradley was punished under a rule that proscribes directing "hostile, sexual, abusive or threatening language or gestures, verbal or written toward another person." Or.Admin.R. 291-105-015(2)(g). Although Bradley does not direct a vagueness or overbreadth challenge to the rules, his challenge reveals a basic contradiction between a prisoner's open, possibly cutting criticism of the conduct of guards which prison grievance systems and the courts invite, and the ODOC rules' mandate of respect for guards in every statement, verbal or written, in every situation. If a line between honest, unabashed airing of a grievance and "hostile, ... [or] abusive" language exists, it is a hazy one, leaving the aggrieved prisoner guessing whether he will be punished for what he has said in his formal prison complaint. As Bradley himself said of the ODOC disrespect regulations, "It is very hard to know what the guards might find disrespectful so it is just safer not to complain."
 
 
 22
 We have previously held that a prison policy requiring prisoners to submit confidential legal papers to prison officials for photocopying can serve as the basis for a claim for the denial of meaningful access to the courts. Casey v. Lewis, 43 F.3d 1261, 1269 (9th Cir.1994). The threat of punishment for an impolitic choice of words burdens the prisoner's right of meaningful access to the courts at least as much as submitting confidential memos to prison officials for copying and occasional perusal.
 
 
 23
 We of course acknowledge the prison's valid interest in the peaceable operation of the prison through the insistence on respect, rather than through violent confrontation. However, the link between this important purpose and the disrespect rules as applied to formal written grievances is weak. The director and his experts argue that to permit the utterance of disrespectful language in any forum at any time would result in a total breakdown of prison security and discipline. Other courts that have addressed this argument in similar contexts have rejected it. See, Loggins v. Delo, 999 F.2d 364, 367 (8th Cir.1993) (statements in prisoner's letter to his brother did not implicate prison security concerns and application of disrespect rules to the letter violated the First Amendment)[2] and cases cited therein. We agree with these courts that such absolutist arguments for enforcement of disrespect rules in every communication public and private overstate their substantial importance.
 
 
 24
 The ODOC's legitimate security concerns would be largely served by procedures that require grievances to be in writing and shield those prison officials who are in direct contact with the inmates from reading any insulting remarks that might be contained in those grievances. Cf. Id. In so saying, we do not mandate any alteration to ODOC's current procedures, but merely state that there are obvious, simple alternatives that both accommodate the prisoner's right to file a grievance and prevent any open expression of disrespect or any disrespectful communication between prisoner and guard or between prisoner and prisoner. It takes little imagination to structure a grievance system and regime of disrespect rules that would make a prisoner's statements in a complaint or grievance invisible to all those involved in the daily operations of the prison, alleviating any security concern. A prisoner's statement in a grievance need not have any more impact on prison security through the maintenance of respect than the prisoner's unexpressed thoughts.
 
 
 25
 Likewise, the rehabilitative aims of the disrespect rules are legitimate penological interests, but are overshadowed by the importance of the prisoner's right of access to the courts in the context of filing a grievance. If there is any time a prisoner should be permitted to speak freely, it is at the bar of justice.
 
 CONCLUSION
 
 26
 Because the legitimate penological interests the rules serve could be accommodated without burdening a prisoner's fundamental right of access to the courts, the application of the ODOC Disrespect III rule, Or.Admin.R. 291-105-015(2)(g), to the content of Bradley's written grievance represents an "exaggerated response." Turner v. Safley, 482 U.S. at 89-90, 107 S.Ct. at 2261-62. Therefore, the ODOC Disrespect III rule, though facially valid, is invalid as applied to Bradley's written grievance. We leave open the possibility that there may be situations in which prison officials may properly discipline inmates for criminal threats contained in written grievances. Today we hold only that prison officials may not punish an inmate merely for using "hostile, sexual, abusive or threatening" language in a written grievance.
 
 
 27
 AFFIRMED.
 
 
 
 *
 The Honorable William W. Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation
 
 
 [1]
 Bradley challenges the constitutional validity of the disrespect rules only as applied to written grievances. Whether prison officials impermissibly punished Bradley in retaliation for his filing a grievance is a separate issue not present in this appeal
 
 
 [2]
 We recognize that the court in Loggins v. Delo was applying the more stringent test under Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974) used to judge censorship of a prisoner's outgoing mail. However, the reasoning of that opinion regarding the low security risk posed by written material not addressed to prison officials applies with equal force here