195 F.3d 1121 (9th Cir. 1999)
 KEVIN MURPHY, Plaintiff-Appellant,
v.
ROBERT SHAW, Unit Sergeant; LARRY BEARLEY, Hearings Officer; MICHAEL MAHONEY, Bureau Warden; MYRON BEESON, Bureau Warden; and RICHARD S. DAY, Director, Department of Corrections, Defendants-Appellees.
 No. 97-35989
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted March 12, 1999--Seattle, Washington
Filed November 4, 1999
 
 [Copyrighted Material Omitted]
 Jeffrey T. Renz, Montana Defender Project, University of Montana School of Law, Missoula, Montana, for the plaintiff-appellant.
 David L. Ohler, Assistant Attorney General, Montana Department of Corrections, Helena, Montana, for the defendants-appellees.
 Appeal from the United States District Court for the District of Montanal; Charles C. Lovell, District Judge, Presiding. D.C. No.CV 95-00062-CCL
 Before: Betty B. Fletcher, Stephen Reinhardt, and Sidney R. Thomas, Circuit Judges.
 B. FLETCHER, Circuit Judge:
 
 
 1
 Plaintiff-Appellant Kevin Murphy ("Murphy") is an inmate law clerk at the Montana State Prison ("Prison"). In early 1995, he sent a letter containing legal advice to fellow inmate Pat Tracy ("Tracy"). Murphy was subsequently disciplined based on the content of that letter. In this action, Murphy alleges that the discipline imposed by the Prison violated his First Amendment rights, his right as an inmate to access to the courts, and his rights under the Due Process Clause. The district court granted summary judgment in favor of the defendants on all his claims. Because the provision of legal assistance to fellow inmates is an activity protected by the First Amendment, and because the prison regulations challenged here are "an exaggerated response" to otherwise legitimate security concerns, we reverse and remand with instructions that summary judgment be entered in Murphy's favor.
 
 FACTS AND PROCEDURAL HISTORY
 
 2
 In early 1995, Murphy, who had been trained as an inmate legal clerk by the Prison, became aware that Tracy, a fellow inmate, had been charged with assaulting Correctional Officer Glen Galle ("CO Galle"). Murphy had provided legal assistance to Tracy on several prior occasions, and learned that Tracy had requested his assistance in connection with the assault charge. Because Tracy had been transferred to the maximum security wing of the Prison, however, Murphy could not visit him directly. Murphy also knew that counsel had been appointed to represent Tracy. Nevertheless, Murphy began investigating the assault incident, and discovered that other inmates had previously complained about CO Galle's conduct.
 
 
 3
 On February 16, 1995, Murphy wrote a letter to Tracy which included the following:
 
 
 4
 . . . I do want to help you with your case against Galle. It wasn't your fault and I know he provoked whatever happened! Don't plead guilty because we can get at least 100 witnesses to testify that Galle is an over zealous guard who has a personal agenda to punish and harass inmates. He has made homo sexual advances towards certain inmates and that can be brought up into the record. There are petitions against him and I have tried to get the Unit Manager to do something about what he does in Close II, but all that happened is that I received two writeups from him myself as retaliation. So we must pursue this out of the prison system. I am filing a suit with everyone in Close I and II named against him. So you can use that too!
 
 
 5
 Another poiont [sic] is that he grabbed you from behind. You tell your lawyer to get a hold of me on this. Don't take a plea bargain unless it's for no more time....
 
 
 6
 Murphy knew that the letter would be read by prison officials pursuant to prison regulations. The letter was, in fact, intercepted and read by defendant Robert Shaw[1].
 
 
 7
 As a result of the February 16 letter, Murphy was "written up." Defendant Shaw completed three Major Misconduct Violation Reports (also known as "Class IIs") charging Murphy with violating the following Prison regulations: Rule 009 (Insolence), Rule 022 (Interference with Due Process Hearings), and Rule 025 (Conduct which Disrupts or Interferes with the Security or Orderly Operation of the Institution). After a hearing, defendant Larry Bearley found Murphy guilty of violating Rules 009[2] and 022.[3] Murphy was given a suspended sentence of 10 days detention and received three "reclassification points." Murphy's appeal was denied by defendant Michael Mahoney.
 
 
 8
 In October 1995, Murphy filed a complaint against Robert Shaw, Larry Bearley, Michael Mahoney, Myron Beeson, and Richard Day, all employees of the Montana Department of Corrections (collectively, "Defendants"). The complaint, filed as a class action on behalf of all inmate law clerks at the Prison, seeks injunctive and declaratory relief pursuant to 42 U.S.C. S 1983. The complaint alleges that the Prison's imposition of discipline on Murphy (1) violated the First Amendment; (2) abridged the right of inmates to access to the courts and to present habeas petitions; and (3) relied on prison regulations that are void for vagueness on their face and as applied to legal advice rendered by law clerks.
 
 
 9
 The case was referred for recommendation to a magistrate judge, and Murphy and Defendants subsequently filed crossmotions for summary judgment. Murphy also filed a motion to certify the class. The magistrate judge recommended that Defendants' motion for summary judgment be granted as to Murphy's "right of access to the courts" claims, and that all other motions be denied. Murphy and Defendants each timely filed objections to the magistrate's recommendation. On de novo review, the district court concluded that Defendants' motion for summary judgment should be granted in its entirety, and that Murphy's motion for class certification should be denied.[4]Final judgment was entered by the district court on September 23, 1997. This appeal followed.
 
 ANALYSIS
 
 10
 The district court granted summary judgment in favor of Defendants. A grant of summary judgment is reviewed denovo. See Margolis v. Ryan, 140 F.3d 850, 852 (9th Cir. 1998). We have jurisdiction pursuant to 28 U.S.C.S 1291 and must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there exist any genuine issues of material fact and whether the district court correctly applied the substantive law. See id.
 
 I. Murphy's First Amendment claim
 
 11
 The viability of Murphy's First Amendment claim turns on the application of two established legal principles. First, this court has held that inmates have a First Amendment right to assist other inmates with their legal claims. See Rizzo v. Dawson, 778 F.2d 527, 531 (9th Cir. 1985). Second, where a prison regulation, otherwise generally justifiable, implicates a constitutional interest when applied to a protected class of expression, this court applies a balancing test to insure that the regulation is not an "exaggerated response. " SeeBradley v. Hall, 64 F.3d 1276, 1280 (9th Cir. 1995) (quoting Turner v. Safley, 482 U.S. 78, 89-90 (1987)). From these two principles flows the conclusion that the district court erred in entering summary judgment in favor of Defendants here.
 
 
 12
 A. Was Murphy acting as a law clerk?
 
 
 13
 Defendants focus their attention on what they perceive as a threshold issue. In their view, Murphy was not acting as a law clerk when he wrote and sent the February 16 letter to Tracy. Defendants accordingly argue that this case involves merely an unremarkable instance of discipline for inmate-to-inmate correspondence, comfortably within the general rule that prisons may, in the pursuit of the interest of prison security, intercept and confiscate inmate-to-inmate correspondence without running afoul of the First Amendment. See Turner v. Safley, 482 U.S. at 89 (inmate-to-inmate correspondence may be banned so long as the policy is rationally related to a legitimate penological interest).
 
 
 14
 To support their view, Defendants point out that Murphy was not formally assigned by the Prison's law librarian to serve as Tracy's law clerk. Moreover, Murphy was aware that he could not visit Tracy in the maximum security wing, and that counsel had been appointed for Tracy in connection with the assault charge. The district court also noted that Murphy had not been trained to handle criminal cases. Murphy, in response, notes that Tracy specifically asked for his legal assistance. It is undisputed that Murphy had served as Tracy's law clerk on several occasions in the past. Murphy also contends that law clerk assignment procedures were considerably more informal than indicated by the regulations, and that Murphy responded to Tracy's request for assistance in the usual manner.[5] The contents of the February 16 letter, moreover, plainly relate to Tracy's assault charge, suggesting to Tracy a self-defense theory that he might raise.
 
 
 15
 On the basis of the undisputed facts, we reject Defendants' threshold argument that Murphy was not acting as a law clerk when he wrote the February 16 letter. Murphy was a trained inmate law clerk responding to a legal inquiry from a fellow inmate, an inmate he had advised on several prior occasions. The letter he sent to Tracy was plainly related to the pending assault charges, and conveyed both factual and legal information that was potentially relevant to Tracy's defense. As will be discussed below, this circuit in Rizzo v. Dawson, 778 F.2d 527, 531 (9th Cir. 1985), recognized that the provision of legal assistance to a fellow inmate is an activity protected by the First Amendment. The undisputed facts here are enough to raise the First Amendment right recognized in Rizzo. Cf. Rizzo, 778 F.2d at 531 (plaintiff offered legal advice informally, outside any "inmate law clerk" program sponsored by the prison).
 
 
 16
 B. Does the Prison's conduct implicate Murphy's First Amendment rights?
 
 
 17
 The Prison's imposition of discipline on Murphy implicates his First Amendment rights for at least two reasons. First, the letter itself constitutes speech that, outside of the prison context, would doubtless enjoy the protection of the First Amendment. The fact that the speech occurs inside the prison walls means that prison authorities may, in appropriate circumstances, regulate the speech, but does not take it outside the reach of the First Amendment altogether. The Supreme Court, for example, has held that censorship of inmate-to-inmate correspondence must be reasonably related to legitimate penological interests in order to pass constitutional muster. See Turner, 482 U.S. at 91 (applying"reasonably related to legitimate penological interests" test to challenged regulation of inmate-to-inmate correspondence).
 
 
 18
 Second, as noted above, the Prison's discipline of Murphy implicates the First Amendment right recognized by this court in Rizzo. In that case, we held that the provision of legal assistance to fellow inmates is an activity protected by the First Amendment. See Rizzo, 778 F.2d at 531; see also Pratt v. Rowland, 65 F.3d 802, 806-07 (9th Cir. 1995) (reaffirming vitality of Rizzo after the Supreme Court's decision in Sandin v. Conner, 115 S. Ct. 2293 (1995)). Rizzo involved a claim by a "jailhouse lawyer" that prison authorities had reassigned him out of a prison vocational program in retaliation for his assisting other inmates with habeas petitions and civil rights actions. See id. We held that his legal activities on behalf of other inmates implicated associational rights protected by the First Amendment. See id. To the extent such a right exists,[6] the Prison's decision to discipline Murphy in the instant case undoubtedly interferes with that right.
 
 
 19
 C. Is the infringement of First Amendment rights justified under the Turner v. Safley test?
 
 
 20
 We next ask whether the Prison's infringement of Murphy's First Amendment rights is justified in light of "legitimate penological interests." See Turner, 482 U.S. at 89. Although "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution," see id. at 84, the courts must accord deference to prison authorities on matters within their expertise, see id. at 85. The Supreme Court has designed a special standard of review for the prison context: "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." Id. at 89; accord Thornburgh v. Abbott, 490 U.S. 401, 409 (1989). While this standard is quite deferential, the Supreme Court has cautioned that "a reasonableness standard is not toothless." Abbott, 490 U.S. at 414.
 
 
 21
 In evaluating the "reasonableness" of a prison's invasion into the constitutional rights of prisoners, the Supreme Court has instructed lower courts to evaluate four factors: (1) whether the governmental objective is legitimate and neutral, and whether the prison regulation is rationally related to that objective; (2) whether there are alternate means of exercising the rights that remain open to prison inmates; (3) what impact accommodation of inmates' rights would have on guards, other inmates, and prison resources; and (4) the availability of obvious, easy alternatives to the challenged prison regulation. See Abbott, 490 U.S. at 414-18; accord Mauro v. Arpaio, F.3d , (9th Cir. 1999) (en banc).
 
 
 22
 1. Rational relation to a legitimate, neutral governmental interest.
 
 
 23
 The interest advanced by Defendants here is the general interest in security and order. It is undisputed that this interest is legitimate. See, e.g., Abbott, 490 U.S. at 415 (prison security is a purpose central to all other corrections goals). It also appears to be "neutral" in the relevant sense -"the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression." Id. Finally, it is also plain that, as a general matter, the Prison Rules at issue-Rule 009 (Insolence) and 022 (Interference with Due Process Hearings) -are rationally related to the Prison's stated interest.
 
 
 24
 Murphy, however, is not challenging the regulations as applied to inmate correspondence generally. Rather, Murphy attacks the regulations as applied to legal correspondence between an inmate performing the functions of a law clerk and the inmate he is advising. When a prison regulation, while rationally-related to a legitimate interest in the general case, threatens constitutional interests as applied to a particular category of protected expression, we must inquire whether the prison rule is "an exaggerated response." Bradley v. Hall, 64 F.3d 1276, 1280 (9th Cir. 1995). In answering this question, the court "must balance the importance of the prisoner's infringed right against the importance of the penological interest served by the rule." Id. The court must also "examine the strength of the logical nexus between the penological purpose served and restriction of the prisoner's rights. " Id[7].
 
 
 25
 Here, the enforcement of the prison regulations against Murphy infringes on his First Amendment right to provide legal assistance to fellow inmates. See Rizzo, 778 F.2d at 531. At the same time, the Prison's interest in security and order is at a low ebb when the correspondence in question is legal advice relating to a pending or potential case. The Prison, for example, has little reason to enforce Rule 009 (Insolence) in this context, since it can easily shield corrections officers from any "alarming" statements contained in inmate mail. See Bradley, 64 F.3d at 1281 (prison can easily shield COs who have direct contact with inmates from contents of inmate mail). Similarly, the contents of correspondence regarding cases is unlikely in itself to cause the harms or injuries that Rule 022 is intended to prevent.
 
 
 26
 Thus, it appears that the "logical nexus" here between the governmental interest and the application of the rules to law clerk correspondence is weak. The Bradley balance appears to favor Murphy, suggesting that the prison regulations, as applied to him, are an "exaggerated response."
 
 
 27
 2. Alternate means of exercising the infringed right.
 
 
 28
 It does not appear that Murphy has any alternative means to exercise his right to render legal assistance to maximum security inmates who, like Tracy, he is not permitted to visit. Although Defendants suggest that Murphy could have forwarded his letter directly to Tracy's appointed counsel, there is nothing in the record indicating that Murphy had access to that lawyer's name or address.
 
 
 29
 3. Impact on prison employees, other inmates, and prison resources.
 
 
 30
 Murphy asks that law clerks not be subject to discipline based on the content of the legal advice they provide. He does not suggest that law clerk correspondence be immune from interception and review. Accordingly, prison officials could continue to monitor correspondence and discipline law clerks for any improper material that does not relate to legal action. Because Prison officials already review internal inmate mail, evaluating content on a variety of criteria, Murphy's proposed solutionwould entail no additional burden on prison resources. Similarly, so long as corrections officers who directly interact with inmates are shielded from the mail, there is no risk of their being exposed to "alarming" statements about themselves. See Bradley, 64 F.3d at 1281 (prison's security concerns could be easily addressed by "shield[ing] those prison officials who are in direct contact with inmates from reading any insulting remarks that might be contained in . . . grievances."). We conclude that the impact on prison employees and resources would be minimal.
 
 
 31
 4. Availability of easy, obvious alternatives.
 
 
 32
 As noted in the preceding section, the purposes of Rule 009 (Insolence) can easily be accommodated by shielding corrections officers who have direct contact with inmates from inmate mail. The fact that the prison officials will read the legal correspondence should be adequate protection against the implementation of any plan to interfere with Due Process Hearings (Rule 022).
 
 
 33
 D. Conclusion.
 
 
 34
 In light of the weak nexus between the government's stated penological interest and the category of law clerk correspondence, as well as the availability of ready alternatives, we conclude that the Prison's conduct here constitutes an "exaggerated response." See Bradley, 64 F.3d at 1280. Accordingly, we reverse the district court's grant of summary judgment in favor of Defendants with respect to Murphy's First Amendment claim.
 
 
 35
 In addition, we conclude that summary judgment should be entered in Murphy's favor on his First Amendment claim. The relevant facts are undisputed: Murphy is a law clerk; his letter to Tracy contained legal advice; as applied to legitimate law clerk correspondence, Rules 009 and 022 are an "exaggerated response" to the Prison's interest in security and order, and thus impermissibly infringe Murphy's First Amendment rights. Defendants have failed to identify any issue of material fact that would defeat this legal conclusion.
 
 
 36
 II. Right of Access to the Courts and Due Process Claims As noted at the outset, Murphy also argues that the Prison's interference with law clerk mail infringes inmates' right of access to the courts. See Lewis v. Casey, 116 S. Ct. 2174 (1996); Bounds v. Smith, 430 U.S. 817 (1977). Because we believe he is entitled to summary judgment on his First Amendment claim, we do not reach Murphy's "right of access to the courts" arguments.
 
 
 37
 We must, however, address at least a portion of Murphy's due process claim. Murphy contends that Rule 009 and Rule 022, both as applied to him and on their face, are so vague as to violate principles of due process. In light of our resolution of Murphy's First Amendment claim, we do not reach his "as applied" challenge to the Prison rules at issue.
 
 
 38
 As for Murphy's facial challenge to Rule 009 and 022, we begin with the proposition that "[i]t is clearly established, both by common sense and precedent, that due process requires fair notice of what conduct is prohibited before a sanction can be imposed." Newell v. Sauser, 79 F.3d 115, 117 (9th Cir. 1996). Consequently, in order to comply with the dictates of the Due Process Clause, a prison regulation must provide fair notice of what is prohibited before a sanction can be imposed. See id.; accord Rios v. Lane, 812 F.2d 1032, 1039 (7th Cir. 1987); Adams v. Gunnell, 729 F.2d 362, 36869 (5th Cir. 1984).
 
 
 39
 Murphy maintains that Rules 009 and 022 do not adequately define the conduct that comes within their scope. This argument fails to persuade -the regulations certainly provide adequate notice to prisoners generally. Rule 009, for example, applies to "words . . . intended to harass or cause alarm in an employee." This definition is supplemented by the followingexamples: "Cursing; abusive language, writing or gestures directed to an employee." Rule 022, while it lacks a general definition, provides a laundry list of clear examples: "Intimidating or tampering with an informant or witness; tampering with or destroying evidence; interfering with an employee in the process of writing a conduct report; making a false statement of misconduct against another inmate or staff that could result in disciplinary action." While clearer language could be imagined, the challenged regulations are the sort that every prison enforces in order to maintain order. Murphy has not produced any authority to support his facial challenge, and we reject it.
 
 CONCLUSION
 
 40
 The district court's decision is REVERSED and the matter REMANDED with instructions to enter summary judgment in Murphy's favor and for the crafting of an appropriate remedy.
 
 
 
 Notes:
 
 
 [1]
 Tracy, having never seen the letter, ultimately pleaded guilty to the assault charge. It does not appear that Tracy or his counsel ever were made aware prior to the plea of the information in Murphy's letter.
 
 
 [2]
 Rule 009 prohibits the following:
 Insolence: Words, actions or other behavior which is intended to harass or cause alarm in an employee.
 [Examples:] Cursing; abusive language, writing or gestures directed to an employee.
 
 
 [3]
 Rule 022 prohibits the following:
 Interference with Due Process Hearings [Examples:] Intimidating or tampering with an informant or witness; tampering with or destroying evidence; interfering with an employee in the process of writing a conduct report; making a false statement of misconduct against another inmate or staff that could result in disciplinary action. (This violation should not be charged for as a retaliation for the writing of a grievance.)
 
 
 [4]
 Murphy has not appealed the denial of his motion for class certification.
 
 
 [5]
 Defendants have introduced no evidence rebutting Murphy's account of the actual operation of the law clerk assignment process.
 
 
 [6]
 We note that several of our sister circuits have refused to recognize a constitutional right to assist others in pressing legal claims. See, e.g., Gibbs v. Hopkins, 10 F.3d 373, 378 (6th Cir. 1993) ("[N]o constitutional right to assist exists."); Smith v. Maschner, 899 F.2d 940, 950 (10th Cir. 1990) (an inmate "does not have a protected interest in providing legal representation to other inmates"); Gassler v. Rayl, 862 F.2d 706, 708 (8th Cir. 1988) ("[A]n inmate simply does not have the right to provide his fellow inmates with legal assistance.").
 
 
 [7]
 The court in Bradley provided the following illustration:
 A prison rule requiring all inmates to shower on Tuesdays would serve the legitimate penological interest of maintaining hygienic conditions. However, it is unlikely that this Court would permit prison officials to keep a prisoner from attending a court date that happened to fall on a Tuesday. The importance of the prisoner's right to attend his own court date would outweigh the legitimate, though less pressing, prison interest in a clean, fragrant prison atmosphere. Such a rule would be an exaggerated response. Thus, our analysis does not necessarily end at the recognition that the prison rule was adopted to serve, and actually does serve, a legitimate penological interest.
 Bradley, 64 F.3d at 1280.