Darrick L. HUNTER, Plaintiff,

v.

Brad HEATH, Superintendent of Security and Joe Klika, IMU/DSU Security Manager and, Cristy DeButts, Supervisor of Program Services and, Bill Doman, Program Services Manager and, Officer Orr, IMU/DSU Lieutenant and, Ken Ward, Assistant Superintendent at the Snake River Correctional Institution, in their individual and official capacity, Defendants.

No. CV–99–323–ST.

United States District Court,
D. Oregon.

April 11, 2000.

Darrick L. Hunt, Ontario, OR, Pro se.

Jan Peter Londahl, Dept. of Justice Administration, Salem, OR, for Defendants.

## OPINION AND ORDER

STEWART, United States Magistrate Judge.

### *INTRODUCTION*

Plaintiff, Darrick L. Hunter ("Hunter"), an inmate at the Snake River Correctional Institution ("SRCI") appearing *pro se,* brings this action under the Civil Rights Act of 1871, 42 U.S.C. § 1983, against various SRCI employees for unlawfully terminating his prison job/assignment as an inmate legal assistant. Hunter alleges that defendants fired him for filing an inmate communication form ("kyte") regarding the alleged confiscation of inmate Michael Petrie's ("Petrie") legal materials. He alleges that his termination was in retaliation for asserting his free speech rights and his right to petition the government for redress of his grievances. He also alleges that defendants denied him due process of law when they terminated him without notice, inflicted cruel and un-

usual punishment on him when they refused to reinstate him to his inmate legal assistant position, and denied him equal protection of the laws by not reinstating him even though the disciplinary charges levied against him were dismissed while other similarly situated prisoners retained their positions after disciplinary charges levied against them were dismissed.

As a result, Hunter alleges that defendants violated his: (1) Eighth Amendment right against cruel and unusual punishment;[1] (2) Fourteenth Amendment right to due process of law; (3) Fourteenth Amendment right to equal protection of the laws; and (4) First Amendment right to petition the government for redress of his grievances. In addition, the introduction to the Amended Complaint alleges that defendants retaliated against Hunter based on the contents of the kyte he filed. This allegation appears to be a claim based on freedom of speech, but the Claims for Relief section does not specifically allege a retaliation claim based on freedom of speech. Because this court must liberally construe *pro se* plaintiffs's complaints, *Karim–Panahi v. Los Angeles Police Dep't*, 839 F.2d 621, 623 (9th Cir.1988), this court will construe the Amended Complaint as also including a § 1983 claim based on retaliation for asserting First Amendment free speech rights. Hunter seeks compensatory and punitive damages for his emotional and physical distress, along with his costs and reasonable attorney fees if the court appoints an attorney to represent him. All parties have consented to allow a Magistrate Judge to enter final orders and judgment in this case in accordance with FRCP 73 and 28 U.S.C. § 636(c).

Now before the court is defendants' Motion for Summary Judgment (docket # 25). For the reasons set forth below, defendants' motion is granted in part and denied in part.

## FACTS

The SRCI hired Hunter as an inmate legal assistant in the Disciplinary Segregation Unit ("DSU")/Intensive Management Unit ("IMU") library on October 10, 1998, where he worked until the SRCI removed him on February 9, 1999. An inmate legal assistant is authorized to "assist other inmates with their legal concerns when requested by assisting inmates in the preparation and filing of legal documents with the courts through consulting, legal research, and typing, as necessary." OAR 291–139–0015(2)(a).

Lynn Hust ("Hust"), current SRCI Library Coordinator, was Hunter's immediate supervisor from the day he began work through January 3, 1999. Susan Deonier ("Deonier"), an SRCI Correctional Counselor, was the Library Coordinator in the DSU between January 14, 1998, and May 25, 1999, and Hunter's immediate supervisor between January 4 and February 9, 1999. Hust advises any inmate who begins working as a legal assistant that: (1) he will be held to a higher standard than other workers at the SRCI because of the unique high security location of the DSU/IMU Library; (2) every rule must be strictly complied with; and (3) any violation or deviation from the rules or policies would result in termination.

On January 13, 1999, Petrie came to the DSU Library claiming that prison officials had taken his legal papers. Hunter had prepared two prior *habeas* petitions for Petrie to file in court which, according to Petrie, SRCI staff had confiscated before he could file them. Petrie's January 13, 1999 complaint apparently related to yet another *habeas* petition that SRCI staff confiscated before he could file it with the court. Petrie discussed his complaint with

---

1. As part of this claim, Hunter also alleges that defendants' conduct constitutes negligence. Since Hunter did not plead negligence as a separate Claim for Relief, this court will not construe it as a separate claim but will instead consider it as part of Hunter's Eighth Amendment claim.

Hunter and Deonier. Hunter claims that at that time, the inmate legal assistants were receiving numerous complaints about prison officials' mistreatment of DSU/IMA prisoners which was causing them an overwhelming amount of stress and crippling their ability to perform their job duties.

Upset at Petrie's situation, Hunter sent a kyte the next day to defendant Brad Heath ("Heath"), SRCI Superintendent of Security. The SRCI encourages inmates to utilize the inmate communication process by first sending kytes to the lowest prison official level to resolve disputes between themselves and prison staff, or to complain about other staff or prisoners. That kyte states as follows:

I helped Petrie prepare legal documents to the courts. It has come to my attention that Petrie's legal materials were confiscated because he refused to reveal names about harm to him because of fear for him and his families safety. . . . I personally helped him prepare legal documents and now those documents are missing. His legal materials were destroyed and mixed-up as well. I'm asking that you inquire into this matter because Petrie said all this happened after he spoke with you. I was extremely disturbed by this conduct, because not only does it effect Petrie, it also effects or obstruct my ability to provide him adequate legal assistance. . . . Therefore, I ask for your assistance in helping Petrie get his legal documents back.

Affidavit of Darrick L. Hunter ("Hunter Aff"), Exhibit ("Ex") 5, pp. 1–2.

On February 1, 1999, Heath, through defendant Joe Klika ("Klika"), DSU/IMU Security Manager, asked defendant Captain Orr, Operations Captain for Special Housing, to conduct an investigation concerning Hunter's kyte. During the course of her investigation, Captain Orr learned that Hunter had not received explicit authorization from SRCI staff to file a complaint on behalf of another prisoner. Captain Orr believed that Hunter had exceeded his duties as an inmate legal assis-

tant by filing the kyte. She also believed that he was soliciting staff to address another prisoner's problems and was attempting to acquire power by establishing himself as a spokesperson on behalf of prisoners in dealing with prison administrators. She felt that allowing a prisoner that kind of authority is plainly contrary to the security interests of a prison because it could jeopardize and weaken the authority and control that prison officials must maintain.

In a memorandum dated February 10, 1999, Captain Orr notified Hunter that he had been terminated from his work assignment effective February 9, 1999, because he had "exceeded [his] realm of responsibility as an Inmate Legal Assistant." That same day, she prepared a misconduct report charging Hunter with disobedience of an order and providing false information to staff based on the circumstances surrounding the kyte he sent to Heath. On February 19, 1999, this misconduct report was dismissed for insufficient evidence. Despite dismissal of the misconduct report, defendants refused to reinstate Hunter as an inmate legal assistant because they believed that he had developed an aggressive and contentious attitude toward staff and that attitude was incompatible with the volatile nature of the security area in which he worked.

Hunter claims that Klika told him that Klika was tired of the inmate legal assistants helping DSU/IMA prisoners challenge his staff and that his goal was to shut down the law library and to permit only one staff member to transport legal materials to and from these prisoners. SRCI officials removed inmate legal assistant Neil Stafford ("Stafford") from his position on February 9, 1999, for exceeding his authority by writing a kyte regarding another prisoner's problem, but he received no misconduct report. On February 12, 1999, SRCI officials removed another inmate legal assistant from his position and issued him a misconduct report that was later dismissed.

Hunter also claims that defendant Ken Ward ("Ward"), Assistant Superintendent at the SRCI, told him and Stafford that they were terminated because of pending lawsuits against the SRCI and for helping prisoners file complaints. Hunter further claims that he informed defendant Cristy DeButts, Supervisor of Program Services, that prison officials were violating his constitutional rights and their own policies but, after meeting with the defendants, she advised him that no one was willing to overturn Captain Orr's decision to terminate him.

### STANDARDS

FRCP 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party shows the absence of an issue of material fact, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Id.* at 324, 106 S.Ct. 2548. A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of Am. v. Phelps Dodge Corp.,* 865 F.2d 1539, 1542 (9th Cir.), *cert. denied,* 493 U.S. 809, 110 S.Ct. 51, 107 L.Ed.2d 20 (1989).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). The court must view the inferences drawn from the facts in the light most favorable to the non-moving party. Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id.* at 630–31. However, when the non-moving party's claims are factually implausible, that party must come forward with more persuasive evidence than would otherwise

be required. *California Architectural Bldg. Prods., Inc. v. Franciscan Ceramics Inc.,* 818 F.2d 1466, 1470 (9th Cir.1987), *cert. denied,* 484 U.S. 1006, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). The Ninth Circuit has stated, "No longer can it be argued that any disagreement about a material issue of fact precludes the use of summary judgment." *Id.* at 1468.

This court advised Hunter of the federal summary judgment standards on August 6, 1999 (docket #17). *See Klingele v. Eikenberry,* 849 F.2d 409, 411–12 (9th Cir. 1988) (advising *pro se* prisoner of summary judgment requirements under FRCP 56).

### DISCUSSION

Defendants seek summary judgment on the basis that they are qualifiedly immune from liability for damages. They also argue that Hunter is not entitled to equitable relief because no significant possibility exists that is both real and immediate that he will be harmed in the future by any unconstitutional practices.

Although not addressed by defendants' motion, Hunter must establish that he suffered a constitutional injury before a qualified immunity analysis applies. Therefore, this court must first determine whether Hunter has alleged any cognizable claim.

### I. *Eighth Amendment*

Hunter asserts that defendants violated his Eighth Amendment rights apparently because he is now unable to earn the same monetary awards or incentives as similarly situated prisoners who can: (1) purchase personal necessities such as canteen items and materials from the Board of Parole and Post–Prison Supervision; (2) pay expenses for court-ordered garnishments, legal copies, postage, contributions to charity, self-elected programs and other services; and (3) save money for release purposes.

## A. *Legal Standard*

■ The Eighth Amendment prohibits prisons from inflicting cruel and unusual punishment on prisoners. "The Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (citations omitted). "The Amendment also imposes duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " *Id.* quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). "[O]nly those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (internal quotations omitted).

■ To prevail on an Eighth Amendment claim, an inmate must satisfy both an objective and a subjective requirement. First, "the deprivation alleged must be, objectively, 'sufficiently serious;' a prison official's act or omission must result in the denial of 'the minimal civilized measure of life's necessities.' " *Farmer,* 511 U.S. at 834, 114 S.Ct. 1970 (internal citations omitted).

■ Second, the prison officials must have acted with deliberate indifference to prisoner health or safety. *Id.* "Deliberate indifference" is a higher standard than negligence and requires that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837, 114 S.Ct. 1970. A prison official may know of a substantial risk "from the very fact that the risk was obvious." *Id.* at 840, 114

S.Ct. 1970. However, prison officials avoid liability if "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* at 844, 114 S.Ct. 1970. Furthermore, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* "Exercising poor judgment ... falls short of meeting the standard of consciously disregarding a known risk to [a prisoner's health]." *Lewis v. Richards,* 107 F.3d 549, 554 (7th Cir.1997).

## B. *Analysis*

■ Hunter's Eighth Amendment claim is based on defendants' decision to terminate, and subsequent decision not to reinstate him to, his job/assignment as an inmate legal assistant which allegedly caused him to suffer financial difficulty. He alleges no infliction of pain. "Today the Eighth Amendment prohibits punishments which, although not physically barbarous, 'involve the unnecessary and wanton infliction of pain,' or are grossly disproportionate to the severity of the crime." *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981) (internal and external citations omitted). "General limitation of jobs and educational opportunities is not considered punishment." *Baumann v. Arizona Dep't of Corrections,* 754 F.2d 841, 846 (9th Cir.1985), citing *Rhodes v. Chapman,* 452 U.S. 337, 348, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981); *Hoptowit v. Ray,* 682 F.2d 1237, 1254–55 (9th Cir. 1982). The Ninth Circuit has held that financial injury "does not offend the standards of decency in modern society" for Eighth Amendment purposes. *Baumann,* 754 F.2d at 846. Besides, Hunter could obtain another job assignment which would allow him to purchase his personal necessities. Thus, his termination, even if unlawful, is not "grossly disproportionate to the severity of his crime."

This court cannot conclude that removing Hunter from his inmate legal assistant position constitutes cruel and unusual punishment. Accordingly, defendants' motion for summary judgment against the Eighth Amendment claim is granted.

## II. *Fourteenth Amendment*

Hunter also alleges that defendants violated his due process and equal protection rights under the Fourteenth Amendment by removing him from his inmate legal assistant position.

### A. *Due Process*

■ Defendants allegedly violated Hunter's Fourteenth Amendment due process rights "by failing to provide him with reasonable notice that a[sic] inmate can be terminated or removed from their job or qualifying program assignment for failure to satisfactorily perform in a program assignment." This claim is without merit.

It is uniformly well established throughout the federal circuit courts that a prisoner's expectation of keeping a specific prison job, or any job, does not implicate a property or liberty interest under the Fourteenth Amendment. *James v. Quinlan*, 866 F.2d 627, 630 (3rd Cir.), *cert denied*, 493 U.S. 870, 110 S.Ct. 197, 107 L.Ed.2d 151 (1989). *See also Coakley v. Murphy*, 884 F.2d 1218, 1221 (9th Cir. 1989) (no constitutional right to continuation in work release program to implicate property interest under Fourteenth Amendment); *Flittie v. Solem*, 827 F.2d 276, 279 (8th Cir.1987) (inmates have no constitutional right to be assigned a particular job); *Ingram v. Papalia*, 804 F.2d 595, 596 (10th Cir.1986) (Constitution does not create a property interest in prison employment); *Adams v. James*, 784 F.2d 1077, 1079 (11th Cir.1986) (assignment to job as law clerk does not invest inmate with a property interest in continuation as such); *Gibson v. McEvers*, 631 F.2d 95, 98 (7th Cir.1980) (prisoner's expectation of keeping prison job does not amount to a property interest entitled to due process

protection); *Altizer v. Paderick*, 569 F.2d 812, 813 (4th Cir.), *cert denied sub nom.*, *Altizer v. Young*, 435 U.S. 1009, 98 S.Ct. 1882, 56 L.Ed.2d 391 (1978); *Bryan v. Werner*, 516 F.2d 233, 240 (3rd Cir.1975) (inmates expectation of keeping job is not a property interest entitled to due process protection).

Because Hunter has no property or liberty interest in his inmate legal assistant position, he has no due process rights arising out of his removal from that position. *See Sandin v. Conner*, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Baumann*, 754 F.2d at 843–44. Therefore, he has no due process claim under the Fourteenth Amendment and defendants' motion for summary judgment against that claim is granted.

### B. *Equal Protection*

Defendants allegedly violated Hunter's right to equal protection of the laws under the Fourteenth Amendment "by refusing to allow [him] to enjoy the same privileges or benefits that other inmates enjoy under the same circumstances when the adjudicator dismisses their disciplinary charges."

### C. *Legal Standard*

■ To state a § 1983 claim under for a violation of the Equal Protection Clause, prisoners must show intentional discrimination. *Sischo–Nownejad v. Merced Community College Dist.*, 934 F.2d 1104, 1112 (9th Cir.1991). "When a state policy does not adversely affect a suspect class or impinge upon a fundamental right, all that is constitutionally required of the state's program is that it be rationally related to a legitimate state object." *Coakley v. Murphy*, 884 F.2d 1218, 1222 (9th Cir.1989), citing *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 314, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976).

### D. *Analysis*

■ Hunter apparently argues that for purposes of his equal protection claim, the

similarly situated group is prisoners who have had disciplinary charges brought against them which were dismissed by an adjudicator and who were then reinstated to their prior job/assignment. He claims that defendants violated his equal protection rights because Captain Orr refused to reinstate him to his inmate legal assistant position even after an adjudicator determined that he had not violated any disciplinary rules.

Although Hunter has attempted to define a similarly situated class for his equal protection claim, the proposed class is in fact not similarly situated to him. First, other prison jobs/assignments are not comparable to Hunter's job. An inmate legal assistant position is a highly sought-after position with more power than the average prison job/assignment. Consequently, prison authorities are more cautious about hiring prisoners for these positions and have more safety concerns about who may fill these positions as compared to other prison jobs/assignments. Thus, even if disciplinary charges previously brought against a prisoner are dismissed, the prisoner's conduct which caused the instigation of disciplinary charges may create other concerns for the prison authorities, precluding that prisoner from remaining qualified to be an inmate legal assistant. In contrast, those concerns would not exist for other prison jobs/assignments, and may explain why those prisoners may have been reinstated to their former positions.

Second, the reason for another prisoner's termination or disciplinary charge may not be comparable to Hunter. Defendants contend that they terminated Hunter because he exceeded the scope of his authority and instigated disciplinary charges against him primarily due to that conduct. Prisoners may be terminated from jobs or disciplined for a myriad of reasons. If the other prisoners were terminated or disciplined for reasons unrelated to the performance of their prison job/assignment, then their situation is not comparable to Hunter's situation.

Because Hunter has not defined a similarly situated class of prisoners with which to compare defendants' actions in this case, he has no equal protection claim. Accordingly, defendants' motion for summary judgment against the equal protection claim is granted.

### III. *First Amendment*

Hunter also alleges that defendants unlawfully retaliated against him by removing him as an inmate legal assistant for asserting his First Amendment right to petition the government for redress of his grievances and First Amendment right of free speech. Specifically, he claims that by sending the kyte to Heath, he was petitioning the prison for redress of his grievance and that the speech contained in the kyte, namely whether SRCI staff confiscated and destroyed Petrie's legal materials, qualifies as expression on a matter of public concern.

Prisoners can bring a claim against prison officials for retaliating against them for exercising their First Amendment rights so long as the retaliatory action did not advance legitimate goals of the correctional institution or was not tailored narrowly enough to achieve such goals. *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985). These goals consist of preserving internal order and discipline at the institution, maintaining institutional security, and rehabilitating prisoners. *See Procunier v. Martinez*, 416 U.S. 396, 412, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974). However, the limitation imposed by the institution must be no greater than is necessary to protect the particular government interest involved. *Id.* at 413, 94 S.Ct. 1800.

At the summary judgment stage in retaliation cases, the prisoner has the initial obligation to prove that prison officials retaliated against him for exercising his First Amendment rights and that the alleged retaliatory action did not advance legitimate penological goals. *Barnett v.*

*Centoni,* 31 F.3d 813, 814–15 (9th Cir. 1994).

### A. *Redress of Grievances*

Although defendants have moved for summary judgment against the entire Amended Complaint, they fail to specifically address Hunter's First Amendment retaliation claim based on his right to petition the government for redress of his grievances. Despite this oversight, this court will determine whether Hunter has such a claim.

■ A prisoner has a First Amendment right to participate in civil rights litigation. The Ninth Circuit has extended a prisoner's right to bring a First Amendment claim based on deprivation of the right to petition for redress of grievances when the prisoner is assisting another prisoner with filing materials in court. *See Rizzo,* 778 F.2d at 531. Further, a prisoner's First Amendment right to meaningful access to the courts, along with his broader right to petition the government for a redress of his grievances, extends to established prison grievance procedures. *Bradley v. Hall,* 64 F.3d 1276, 1279 (9th Cir.1995).

> The "government" to which the First Amendment guarantees a right of redress of grievances includes the prison authorities, as it includes other administrative arms and units of government. *Soranno's Gasco, Inc. v. Morgan,* 874 F.2d 1310, 1314 (9th Cir.1989). Moreover, in some cases a prisoner may be required to exhaust the established prisoner grievance procedure before securing relief in federal court. See 42 U.S.C. § 1997 *et seq.* In those cases, a prisoner's fundamental right of access to the courts hinges on his ability to access the prison grievance system.

*Id.*

### 1. *Protected Right*

■ This court must first determine whether Hunter was engaging in any activity protected by the First Amendment right to petition the government for re-dress of grievances when he filed the kyte. Defendants interpret Hunter's kyte as an improper attempt to assist another prisoner in filing an internal prison grievance. However, that interpretation is contrary to the face of the kyte and this court must look only to the face of the kyte to determine its content for First Amendment purposes.

The face of Hunter's kyte reveals that he filed a grievance concerning his own problem, namely that defendants were impeding his ability to effectively perform his duties as an inmate legal assistant. Hunter had previously drafted two *habeas* petitions for Petrie to file with the courts and then those petitions turned up missing. If the documents are missing, then Hunter must start over again to assist Petrie in preparing and filing legal documents with the courts. The kyte states that Hunter "personally helped [Petrie] prepare legal documents and now those documents are missing." The kyte further states that Hunter "was extremely disturbed by this conduct, because not only does it effect Petrie, it also effects or obstruct my ability to provide him adequate legal assistance." Although the kyte refers to Petrie's problem with SRCI staff, Hunter's problem is intertwined with Petrie's problem and resolution of one necessarily requires resolution of the other. It is difficult to fully separate the two complaints. However, since Hunter signed the kyte and mentions his own problem, the kyte is his own grievance.

Accordingly, Hunter was engaging in protected First Amendment activity by filing a kyte and complaining that his job as an inmate legal assistant was being hindered by SRCI staff's actions. *Bradley* held that a prisoner's First Amendment right to meaningful access to the courts, along with his broader right to petition the government for a redress of his grievances, includes utilizing a prison's established grievance procedure. Therefore, defendants are prohibited from retaliating against Hunter by terminating him from

his inmate legal assistant position for exercising this right.

This right presumes, however, that a kyte is equivalent to a petition for redress of a grievance. A kyte is not a formal prison grievance. However, SRCI officials specifically encourage prisoners to use the kyte system. Hunter has submitted what appears to be a copy of a newsletter distributed by SRCI officials which states that the kyte system "is an excellent tool for inmates to receive answers to specific questions.... To assure the best communication system for everyone involved, it is important to address initial communication to the lowest level." Hunter Aff, Ex 14. The newsletter also states that "[w]hen you advance issues, as is sometimes necessary, to the higher level for initial response, it typically takes longer for responses.... The formal written grievance procedure is to be used only when all other channels of communication have been exhausted." *Id.* Further, OAR 291–109–0015(1)(c) provides that "[i]nmates and offenders are encouraged to use first line staff as a primary means of communication prior to filing a grievance, and to handle questions and complaints at the lowest level." Because of this encouragement or directive, prisoners may feel that it is necessary to file a kyte in order to comply with the prison's procedures. Further, filing of a kyte may lead to a formal grievance if the dispute is not resolved. Therefore, filing of informal prison grievances such as kytes, which the prison essentially pressures prisoners to file before filing a formal grievance, is a protected activity for redress of a grievance under *Bradley*.

#### 2. *Retaliation*

■ In order to prevail on a retaliation claim based on this protected right, Hunter must also prove that defendants retaliated against him for exercising this right. Defendants' true motivation in removing Hunter from his inmate legal assistant position is disputed. To support their argument that Hunter was creating a safety threat by attempting to accrete power and act as a jailhouse spokesperson, defendants point to Captain Orr's affidavit stating that on February 8, 1999, Petrie refused to talk with her regarding her investigation of the kyte because his "attorney is handling this matter" and that he was "not talking to anyone except [his] attorney." However, in his affidavit, Petrie states that he did not tell Captain Orr that Hunter was his attorney, but instead stated that his attorney, Manual Perez, was handling the matter and that he was not going to talk to her about the matter.

Hunter has submitted other evidence to refute defendants' contention that they removed him because of their safety concerns. In his affidavit, Hunter states that Captain Orr told him that:

> you (Hunter) need to learn how to be more considerate of staff and not to challenge their illegal activities on behalf of other inmates, and that if the plaintiff refused to listen to her or take her advice, that your (Hunter) would lose your job and your entire stay at any prison will be extremely dificult [sic].

Hunter Aff, p. 19.

Hunter also states that Klika told him that:

> he (Klika) was tired of the law library in DSU/IMU and the legal assistants helping inmates in challenging his staff and that it was his goal to shut down the law library in DSU/IMU completely and only permit one of his staff members to transport inmate legal mails and material.

*Id.*

In addition, two other inmate legal assistants were removed from their positions at the same time. It is unclear whether defendants retaliated against Hunter for exercising his First Amendment right to petition the government for redress of his grievances by removing him from his inmate legal assistant position or whether

they removed him for other reasons. Thus, an issue of fact exists as to defendants' true motivation and precludes summary judgment for defendants at this stage of the analysis.

### 3. *Legitimate Penological Interest*

Even if defendants retaliated against Hunter based on his exercise of his right to petition the government for redress of his grievance, a prison regulation or prison officials' retaliatory actions may impinge upon a prisoner's constitutional rights so long as they are reasonably related to legitimate penological interests.

The Supreme Court has identified four factors to consider when determining the reasonableness of a prison rule: 1) whether there is a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; 2) "whether there are alternative means of exercising the right that remain open to prison inmates"; 3) "the impact of accommodation of the asserted constitutional right will have on guards and other inmates and on the allocation of prison resources generally"; and 4) the "absence of ready alternatives" or, in other words, whether the rule at issue is an "exaggerated response to prison concerns."

*Bradley,* 64 F.3d at 1279–80, quoting *Turner v. Safley,* 482 U.S. 78, 89–90, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

Although not clearly articulated by defendants, their legitimate penological interest here is safety. Defendants argue that requiring inmate legal assistants to strictly comply with their job duties is important to safety because allowing an inmate legal assistant the power to act as a spokesperson on behalf of other prisoners can jeopardize and weaken the authority and control that prison staff must maintain. The DSU/IMU library is in a high security area which houses prisoners who have problems controlling their behavior, create disturbances, may have psychological or psychiatric problems, and can be manipu-

lative and deceptive. As a result, defendants argue that it is particularly important that inmate legal assistants in the DSU/IMU library restrict their activities to preparing and filing documents with the courts and not support these prisoners' complaints regarding the internal actions of prison staff.

In deciding whether the prison has a legitimate penological interest, this court must be "circumspect when asked to intervene in the operation of state prisons." *Pratt v. Rowland,* 65 F.3d 802, 806 (9th Cir.1995). As the Ninth Circuit noted in *Pratt,* the Supreme Court previously expressed the view " 'in several of our cases that federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment,' especially with regard to 'the finetuning of the ordinary incidents of prison life, a common subject of prisoner claims' under § 1983." *Id.* at 807, quoting *Sandin,* 515 U.S. at 482–83, 115 S.Ct. 2293. "[P]rison administrators ..., and not the courts, are to make the difficult judgments concerning institutional operations." *Turner,* 482 U.S. at 89, 107 S.Ct. 2254.

Although defendants have set forth a legitimate penological interest, they have provided no reason as to why their action of removing Hunter is reasonably related to that interest. As discussed above, defendants misinterpret the true nature of the kyte and apply their legitimate penological interest to that misinterpretation. They have not applied their legitimate penological interest to the kyte as Hunter's personal grievance. Defendants' concern that Hunter would acrete power, become a prison spokesperson, and cause security problems is nonexistent when the kyte is viewed as Hunter's personal grievance. Therefore, this court cannot determine at this juncture whether defendants' action is reasonably related to a legitimate penological interest.

Accordingly, Hunter has a First Amendment claim premised on defendants' retali-

ation against him for petitioning for redress of grievances. Therefore, this court must address whether defendants are entitled to summary judgment based upon their qualified immunity defense.

### B. Free Speech

In order for Hunter to state a First Amendment retaliation claim based on free speech, his speech must be protected by the First Amendment. Resolution of this claim is difficult due to defendants' misinterpretation of Hunter's kyte. Once again, however, this court must look to the face of the kyte to determine the nature of the speech at issue and whether that speech is protected speech under the First Amendment.

#### 1. Protected Speech

##### a. Legal Standard

It is unclear exactly what test applies in determining whether a prisoner's speech is protected speech. Public employees must establish that their speech (while at work) is of a matter of public concern. *Brewster v. Board of Ed. of the Lynwood Unified Sch. Dist.*, 149 F.3d 971, 978 (9th Cir.1998), *cert denied*, 526 U.S. 1018, 119 S.Ct. 1252, 143 L.Ed.2d 349 (1999). The Seventh Circuit applies the same test to prisoners and requires that prisoners' speech is protected under the First Amendment only if it informs prison officials about a prison issue that is a matter of public concern. *Brookins v. Kolb*, 990 F.2d 308, 313 (7th Cir.1993). However, the Ninth Circuit has not expressly expanded the matter of public concern test to prisoners.

Hunter and defendants assume that Hunter's speech must touch upon a matter of public concern in order to constitute protected speech under the First Amendment. If Hunter's speech satisfies this test, then this court need not decide the more difficult issue of whether prisoners' speech must touch upon a matter of public concern in order to constitute protected speech.

##### b. Analysis

As discussed above, Hunter's kyte informed defendants that their conduct was hindering Hunter's ability to effectively perform his inmate legal assistant duties. Even though this is a complaint personal to Hunter, as opposed to a grievance on behalf of a class of prisoners, it still touches upon a matter of public concern. Hunter's speech deals with prison officials purposefully preventing an inmate legal assistant from performing his job duties, which in turn affects prisoners' ability to access the courts. Access to the courts by prisoners clearly is a matter of public concern.

#### 2. Retaliation

To prevail, Hunter must prove that defendants retaliated against him for exercising his right of free speech. As discussed above, a question of fact exists as to defendants' true motivation for removing Hunter from his inmate legal assistant position. Because the parties have not addressed the issues surrounding retaliation and the effect of defendants' mistake in interpreting the kyte, resolution of them at this time is premature.

#### 3. Legitimate Penological Interest

Further delaying resolution of this claim is the fact that defendants have proffered no legitimate penological interest that would permit retaliation based on Hunter's complaint about his own problem. Reviewing a legitimate penological interest is a crucial component in the analysis as to whether Hunter has a retaliation claim based on exercising his First Amendment right to free speech.

#### 4. Conclusion

Due to unresolved issues regarding whether defendants retaliated against Hunter based on his speech and whether defendants have a legitimate penological interest to curb that type of speech, Hunter has a First Amendment claim premised

on defendants' retaliation against him for exercising his right of free speech. Therefore, this court must address whether defendants are entitled to summary judgment based upon their qualified immunity defense.[2]

## IV. *Qualified Immunity*

Based on the above, Hunter has two remaining claims for retaliation based on exercising his First Amendment right to petition the government for redress of his grievances and possibly his First Amendment right of free speech. To these claims, defendants assert a qualified immunity defense.

### A. *Legal Standard*

■ Prison officials are entitled to qualified immunity "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Liston v. County of Riverside*, 120 F.3d 965, 975 (9th Cir.1997), citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The qualified immunity defense allows for errors in judgment and protects "all but the plainly incompetent or those who knowingly violate the law.... [I]f [officials] of reasonable competence could disagree on the issue [whether or not a specific action was constitutional], immunity should be recognized." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986); *see also Knox v. Southwest Airlines*, 124 F.3d 1103, 1107 (9th Cir.1997) ("Th[e] test allows ample room for reasonable error on the part of the [government official]").

■ "A court must determine whether, in the light of clearly established principles governing the conduct in question, the [official] objectively could have believed that his conduct was lawful." *Watkins v. City of Oakland*, 145 F.3d 1087, 1092 (9th Cir.

1998). Qualified immunity is a legal issue to be decided by the court and at the earliest possible time in the litigation. *Act Up!/Portland v. Bagley*, 988 F.2d 868, 872 (9th Cir.1992).

■ When a prison official asserts qualified immunity at the summary judgment stage, the court must first determine whether the plaintiff has alleged facts which, if true, would constitute a deprivation of a constitutional right at all. *B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1265 (9th Cir.1999). "Only then should the court determine whether 'the right allegedly implicated was clearly established at the time of the events in question.'" *Id.* quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 841, 118 S.Ct. 1708, 140 L.Ed.2d 1043 n. 5 (1998).

Whether defendants are entitled to a qualified immunity defense requires a two-part analysis: "1) Was the law governing the official's conduct clearly established? 2) Under that law, could a reasonable [official] have believed the conduct was lawful?" *Ram v. Rubin*, 118 F.3d 1306, 1309 (9th Cir.1997), *cert. denied sub nom., Silva v. Ram*, 522 U.S. 1045, 118 S.Ct. 686, 139 L.Ed.2d 633 (1998).

### B. *Analysis*

■ Defendants make only one argument in favor of qualified immunity, namely that they did not violate Hunter's clearly established constitutional rights. To be considered "clearly established" for the purposes of the qualified immunity analysis, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). The Supreme Court "has directed that the inquiry into whether or not a claimed right was

---

**2.** In light of the fact that Hunter may already have a retaliation claim under the First Amendment for petitioning the government for redress of his grievances, this court ques-

tions why he also needs to pursue a retaliation claim under the First Amendment based on the speech contained in the kyte.

'clearly established' must focus upon the right not in a general, abstract sense, but rather in a practical, 'particularized' sense." *Moran v. Washington,* 147 F.3d 839, 845 (9th Cir.1998), quoting *Anderson,* 483 U.S. at 640, 107 S.Ct. 3034. "To show that the right in question here was clearly established, [Hunter] need not establish that [defendants] 'behavior had been previously declared unconstitutional, only that the unlawfulness was apparent in light of preexisting law.' " *Jensen v. City of Oxnard,* 145 F.3d 1078, 1085 (9th Cir.1998), quoting *Blueford v. Prunty,* 108 F.3d 251, 254 (9th Cir.1997).

As discussed above, the Ninth Circuit decided in *Bradley* that a prisoner's First Amendment right to meaningful access to the courts, along with his broader right to petition the government for a redress of his grievances, extends to established prison grievance procedures. The court clearly ruled that a prison could not retaliate against a prisoner for filing a grievance because otherwise, "the prisoner risks punishment for exercising the right to complain" and that would chill his First Amendment rights. Therefore, as of August 23, 1995, prior to Hunter's kyte, the law clearly precluded a prison from retaliating against a prisoner for filing a prison grievance.

The law also is clearly established with respect to Hunter's First Amendment retaliation claim premised on exercising his right to free speech. Defendants' qualified immunity defense to that claim is premised solely on their misinterpretation of the kyte which is more properly analyzed under the second part of the qualified immunity analysis.

■ However, defendants do not address the second part of the qualified immunity analysis, namely whether they objectively could have believed that their conduct was lawful. Nonetheless, as discussed above, a question of fact exists as to defendants' true motivation in removing Hunter from his inmate legal assistant position. In order for this court to be able to determine whether defendants' action was objectively reasonable under the second part of the qualified immunity analysis, the underlying facts regarding defendants' decision to remove Hunter must be undisputed. *Act Up!,* 988 F.2d at 873. Because the true reason why defendants removed Hunter from his position is disputed, this court cannot decide whether defendants are entitled to qualified immunity.

Accordingly, defendants' motion for summary judgment based on qualified immunity against the retaliation claims based on Hunter exercising his First Amendment rights is denied.

## V. *Equitable Relief*

Defendants appear to interpret the Amended Complaint as seeking equitable relief and argue that "because there is no very significant possibility that is both real and immediate that he will be harmed in the future by any unconstitutional practices, plaintiff is not entitled to equitable relief." However, the Amended Complaint does not include any prayer for equitable relief. Therefore, defendants' motion is moot.

■ However, "equitable relief, such as reinstatement of [plaintiff's] job ... is not barred by the prior rulings of this court on immunity from liability for damages. 'Qualified immunity ... does not bar actions for declaratory or injunctive relief.' " *Los Angeles Police Protective League v. Gates,* 995 F.2d 1469, 1472 (9th Cir.1993), quoting *American Fire, Theft & Collision Managers, Inc. v. Gillespie,* 932 F.2d 816, 818 (9th Cir.1991). If Hunter intends to seek equitable relief, such as reinstatement to his inmate legal assistant job/assignment, then he must include such a request in an amended pleading.

## *ORDER*

For the reasons set forth above, defendants' Motion for Summary Judgment (docket # 25) is GRANTED IN PART and DENIED IN PART. All claims are dis-

missed except the retaliation claims based on plaintiff's exercise of his First Amendment right to petition the government for redress of his grievances and his First Amendment right to free speech.