FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JOHN THOMAS ENTLER, *Plaintiff-Appellant*, <br><br> v. <br><br> CHRISTINE GREGOIRE; BERNIE WARNER, AKA Berny Waner; STEVEN SINCLAIR; RON KNIGHT; LYNN IRISH CLARK; PIERCE, MR., *Defendants-Appellees.* | No. 14-35053 <br><br> D.C. No. 2:12-cv-05141-JPH <br><br><br> OPINION |

Appeal from the United States District Court
for the Eastern District of Washington
Lonny R. Suko, District Judge, Presiding

Argued and Submitted April 7, 2017
Seattle, Washington

Filed October 6, 2017

Before: William A. Fletcher and Ronald M. Gould, Circuit
Judges, and Frederic Block,[*] District Judge.

Opinion by Judge Frederic Block

---

[*] The Honorable Frederic Block, United States Senior District Judge
for the Eastern District of New York, sitting by designation.

## SUMMARY[**]

### Prisoner Civil Rights

The panel reversed in part and affirmed in part the district court's dismissal, on the pleadings, of a complaint brought pursuant to 42 U.S.C. § 1983 by a prisoner who alleged that his First Amendment rights were violated when he was disciplined for threatening to initiate civil litigation and file a criminal complaint against prison officials.

Plaintiff was disciplined for his threats under a Washington Department of Corrections regulation that bars prisoners from intimidating or coercing prison staff. With regard to plaintiff's threats to bring civil litigation, the panel disagreed with the district court's conclusions that plaintiff has not alleged an actionable First Amendment retaliation claim and that, alternatively, the prison officials were entitled to qualified immunity. The panel held that threats to sue fall within the purview of the constitutionally protected right to file grievances and that in 2012 it was clearly established that plaintiff had a right to file his grievances and pursue civil litigation. The panel held that taking the complaint as true in the face of a Rule 12(c) motion to dismiss on the pleadings, it could not conclude that a reasonable official would not have understood that disciplining plaintiff for threatening to file a civil suit was constitutionally impermissible.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

With regard to the discipline imposed for plaintiff's threat to file a criminal complaint, the panel held that both the filing of a criminal complaint by a prisoner, as well as the threat to do so, are protected by the First Amendment, provided they are not baseless. The panel nevertheless held that defendants were entitled to qualified immunity because it was not clearly established at the time that the threat to file a criminal complaint was constitutionally protected conduct.

## COUNSEL

Jared R. Wigginton (argued), Stoel Rives LLP, Seattle, Washington, for Plaintiff-Appellant.

Timothy J. Feulner (argued), Assistant United States Attorney; Robert W. Ferguson, Attorney General; United States Attorney's Office, Olympia, Washington; for Defendants-Appellees.

## OPINION

BLOCK, District Judge:

John Thomas Entler ("Entler" or "Appellant") is a prisoner at the Washington State Penitentiary ("WSP"). During the summer of 2012, he took issue with certain incidents at the WSP and submitted written complaints to the prison officials involved.[1] In all but one, Entler threatened to initiate civil litigation if his concerns were not addressed; in the other, he threatened to file a criminal complaint against a number of state officials and have them arrested.[2] Entler was disciplined for these threats under a Washington Department of Corrections ("DOC") regulation that bars prisoners from intimidating or coercing prison staff.

With regard to the threats to bring civil litigation, we disagree with the district court's conclusions that Entler has not alleged an actionable First Amendment retaliation claim and that, alternatively, the prison officials were entitled to qualified immunity. With regard to the threat to file a criminal complaint, we disagree with the district court's implicit conclusion that Entler has not alleged an actionable

---

[1] The caption of the *pro se* Complaint lists the officials in their individual capacities, but the body of the Complaint references them in their official capacities. Nonetheless, as here, "where state officials are named in a complaint which seeks damages under 42 U.S.C. § 1983, it is presumed that the officials are being sued in their individual capacities." *Shoshone-Bannock Tribes v. Fish & Game Comm'n*, 42 F.3d 1278, 1284 (9th Cir. 1994).

[2] Entler thereafter filed the complaint against the officials.

First Amendment retaliation claim[3]; however, we hold that the Defendants were entitled to qualified immunity. Accordingly, we reverse the judgment dismissing the Complaint on the pleadings in part, affirm in part, and remand for further proceedings in accordance with this decision.

# I

## A. The Grievance Process

The DOC has established an Offender Grievance Program to allow prisoner grievances to be "heard and dealt with in a formal manner." The Manual provides, however, that prisoners should "try to informally resolve [their] issue before filing a formal grievance" by submitting a "kite"—a letter on a pre-printed DOC form[4]—to the officer implicated in the issue; consequently, prisoners are "expected . . . to seek informal resolution to [their] concerns through regular administrative channels prior to utilizing the grievance procedure." The Manual is silent, however, as to what action, if any, is required of the officer receiving the kite. It simply provides that if the prisoner cannot resolve the issue informally, he or she may file a formal complaint "[w]ithin 20 working days of the date of the incident."

---

[3] The district court did not separately address Entler's civil and criminal threats, as we do here, but its decision that none of his threats were protected conduct necessarily implies that neither the civil nor criminal threats were actionable.

[4] The DOC's Offender Kite—DOC form 21-473—asks the prisoner's name, DOC number, and location within the prison. It also provides a space for the prisoner to detail the reason why he or she is submitting the kite and a space for the prisoner to write the name of the official with whom they wish to speak.

A prisoner files a formal complaint by submitting a "statement of concern"[5] on the DOC's official Complaint Form—DOC form 5-165—to the prison Grievance Coordinator, who must then respond "[w]ithin 5 working days of the date of receipt." From there, "[t]he grievance coordinator or assigned investigator will: review assigned investigator's instructions; review local policies and procedures; review DOC policies, [Washington Administrative Code], [Revised Code of Washington] as necessary; review inventories, daily logs, medical records, etc[.], as necessary; interview resource staff (doctors, supervisors, chaplain, etc.) for additional perspective, as necessary; interview grievant and/or witnesses as appropriate. Written statements may be accepted." The next step is "[r]eview of the complaint by the Grievance Coordinator," followed by an "[a]ttempt to resolve grievance by the Grievance Coordinator," then "[r]eview by Superintendent/facility supervisor," and, finally, a "[r]eview by Deputy Secretary/designee."

## B. Prisoner Discipline

Prison administration is governed by the Washington Administrative Code ("WAC"). Rule 663 of Section 137-25-030 ("Rule 663") lists as a "serious violation" the use by a prisoner of "physical force, intimidation, or coercion against any person." By contrast, Rule 202 of WAC 137-28-220 ("Rule 202") lists as a "general violation . . . [h]arassing, using abusive language, or engaging in other offensive

---

[5] A "statement of concern" in a formal complaint should identify "the specific written policy or procedure being grieved" and include a description of "what happened or was said."

behavior directed to or in the presence of another person(s) or group(s)."

WAC 137-28 is a comprehensive chapter dealing with prison discipline. It defines an infraction as "[a] term designating the procedures and documents related to offender misconduct and the facility disciplinary process as a result of a rule violation." WAC 137-28-160(6). Each category of infraction—whether general or serious—calls for a separate process and set of sanctions. *See* WAC 137-28-230, 137-28-270. A "general infraction" does not require a hearing and subjects a prisoner to mild sanctions imposed by the prisoner's supervisor, including a "[r]eprimand or warning[,]" an "[i]ssuance of a written order to cease the problematic behavior[,]" and "confinement to cell/room . . . for a period not to exceed ten consecutive days." WAC 137-28-240.

A "serious infraction" requires a staff member who witnesses the serious violation to "prepare and submit an infraction report" to an infraction review officer, who forwards the report to a hearing clerk. WAC 137-28-270. The hearing clerk then schedules a disciplinary hearing before a hearing officer, which the prisoner can choose to attend to listen, testify, and/or call witnesses. *See* WAC 137-28-285. If the hearing officer finds the prisoner guilty of a serious violation, the officer may impose more severe sanctions than those appropriate for a general infraction, including cell confinement, "confinement on isolation status," or "[s]uspension or termination of visitation." WAC 127-28-350.

## C. Entler's Kites and Discipline

The following facts are drawn from Appellant's voluminous *pro se* Complaint[6] relying on 19 attachments, most of which document all of Entler's kites and disciplines.

Entler sought redress for the following issues, which arose in June and July of 2012. Rather than immediately filing *formal* complaints through the Offender Grievance Program, Entler filed several *informal* complaints—as "expected" by the Manual—with the alleged offending officials.

### 1. Wrongful charge to prison account, failure to provide copies of legal documents, and denial of art curio permit

On June 12, 2012, Entler submitted a kite to the WSP Accounting Department contesting a $200 charge to his prison account. In the kite, Entler stated: "The [charge] you added to my account is not from the Superior Court and does not relate to a felony conviction. Please remove it." The WSP Accounting Department responded with a copy of a court order awarding the DOC $200 against Appellant. Entler filed a second kite on June 18, 2012, challenging the WSP Accounting Department's response. In that kite he stated: "Remove the [charge] or I will sue you and make you remove it." Appellant raised the same issue in a letter to the DOC Inmate Accounts Unit on June 20, 2012, stating: "Please remove these illegal [charges] from my account or I will be left with no other alternative but to seek legal redress

---

[6] Although Entler filed his Complaint *pro se*, subsequent to its dismissal he obtained counsel for his appeal.

to make you remove them." After receiving no response for a month, he wrote a second letter to the Inmate Accounts Unit on July 30, 2012, in which he stated, "If you fail to respond to this letter within 20 days, or by August 20, 2012, I will assume that you are not going to respond, and I'll be left with no other alternative by [sic] to seek legal redress to make you remove these illegal [charges] you have added to my Inmate Account."

On June 25, 2012, Appellant submitted kites to the WSP superintendent and Bar Unit Manager Lynn Clark ("BUM Clark") requesting that they fire Baker Unit Counselor Joanna Irwin ("BUC Irwin") for failing to provide him copies of legal documents. He stated: "If you do not fire her for refusing to provide me legal copies, which she has done again, I'll file criminal charges with the Sheriff's office and have you arrested. If I see or hear of here [sic] being at this institution I'll file criminal charges against you and have you arrested." On July 5, 2012, he submitted a lengthy complaint to the Sheriff's Office in Walla Walla County (where the WSP is located) "seeking to initiate criminal charges against the named State Officials."[7] He requested that the Sheriff's Office "arrest these individuals and place them in custody, or issue a citation to them for the mentioned misdemeanor crimes."

On July 18, 2012, Entler received notice that the WSP denied his application for an art curio permit. He sent a kite contesting the denial the same day. In this kite, he stated, "I'll give you 7 working days from 7-19-12 to answer this kite before I exercise my legal rights to file a grievance,

---

[7] Entler's criminal complaint named BUC Irwin, BUM Clark, and Washington State Penitentiary Superintendent Steven Sinclair.

retaliation against me, by you and these staff that are giving you false negitive imput [sic] as a disguise to deny me a [sic] art curio permit." The next day, July 19, BUM Clark visited Entler's cell, and Entler told him that Entler planned to file a formal complaint.

On July 19, 2012, BUM Clark issued Entler a serious infraction in response to these kites, stating that Entler: (1) "has threatened to sue the entire WSP Accounting Department" regarding the $200 charge on his prison account; (2) "has threatened me that he will file criminal charges/arrest by sheriff against me if I do not fire [BUC Irwin]," or "if he sees or hears of [BUC Irwin] being at this institution"; (3) "has threatened" to "file a grievance" if he did not receive a response to his complaint regarding the denial of his application for an art curio permit. BUM Clark stated further that Entler was "using these kites as intimidation and coercion" in violation of Rule 663. A disciplinary hearing was held on August 1, 2012 before Hearing Officer Jackson, who found that "the way [Appellant] worded his verbiage in his kite[s] was intimidating." The hearing officer sentenced Entler to fifteen days of lost "big yard" and gym time. *Id.*[8]

## 2. Compelled work assignment contrary to religious beliefs

The same day that Entler received this serious infraction—July 19—WSP officers informed him of a

---

[8] Although the Hearing Officer only addressed the kites, in an affidavit attached to his *pro se* Complaint Entler stated, "I also argued that Mr. Clark filed the infraction against me because I filed criminal charges on him with the Walla Walla Sheriff's Office."

mandatory job assignment. Entler contested the assignment in a letter to the WSP's Religious Programs Manager that same day. In the letter he stated:

> I'm requesting that DOC recognize my religious beliefs, and stop making me work contrary to my Seriously Held Religious Beliefs rooted in my religion, under threat of punishment for refusing to work. . . . If DOC refuses to recognize my Seriously Held Religious Beliefs I will initiate litigation for violation of my religious rights.

Entler also submitted a kite to BUM Clark on July 22, 2012, in which he stated:

> Since you have made the decision to make me work contrary to my religious belief under threat of being infracted for refusing to work You will be the one I sue for violation of my Religious Civil Rights. You will answer to God for your persecution of me. I will say the Prary [sic] if Psalm 10:1–18 For you, For I am justified by Romans 12:17–21, and by your own deeds you will answer to God, for I have done NO evil to you.

On July 26, 2012, BUM Clark issued Entler a serious infraction for his July 19 letter to the Religious Programs Manager threatening to sue to protect his religious freedom. BUM Clark again claimed that Entler's threat to sue was intimidating and coercive in violation of Rule 663. Entler's disciplinary hearing occurred before Hearing Officer Pierce ("Pierce") on August 15, 2012. Pierce found that Entler "did

in fact harass a [Correctional Unit Supervisor] by sending him a kite stating [Entler's] plans on contacting a program manager and on suing people if they did not agree with his reasons for not being required to work." However, Pierce reduced Entler's violation to a general infraction pursuant to Rule 202. He was sanctioned to five days of cell confinement.

On August 2, 2012, BUM Clark issued another serious infraction for Entler's July 22 kite threatening again to sue to protect his religious freedom. BUM Clark again cited Rule 663 as the basis for the violation. The disciplinary hearing took place before Pierce on August 15. Pierce found that Entler had harassed officers "with kites and grievances threatening legal suits" but reduced his Rule 663 violation to a violation of Rule 202 and WAC 137-28-220 Rule 203 for "ma[king] false claim that CUS Clark made threat of work or be infracted." Pierce warned Entler not to "badger" WSP employees for thirty days or he would receive a serious infraction.[9]

---

[9] On August 2, 2012, Entler filed two *formal* complaints against BUM Clark. The first protested BUM Clark's retaliation against him for his kites regarding the accounting department problems and "the criminal charges filed against [BUM Clark] and Counselor Irwin." The second protested BUM Clark's retaliation against Entler for his kites regarding his religious work conflicts and, once again, "the criminal charges" filed against Clark and Irwin. Grievance Coordinator L. Young summarily dismissed both complaints as unfounded on August 6, 2012, marking in the Grievance Coordinator's Response box on both forms that "[i]t is not a grievable issue."

## 3.  Retaliation

On August 1, 2012, Entler had written letters to Washington Governor Christine Gregoire and DOC Secretary Bernie Warner complaining of retaliatory conduct at the WSP and threatening to contact the U.S. Department of Justice. BUM Clark issued Entler another serious infraction on August 7, 2012, claiming that his August 1 letters to Secretary Warner and Governor Gregoire were coercive and retaliatory in violation of Rule 663 because they contained threats to take legal action.  The disciplinary hearing took place before Pierce on August 15.  Pierce found that Entler's "threats of legal suits" constituted harassment but once again reduced his violation to a general infraction pursuant to Rule 202.  Entler was sanctioned to five more days of cell confinement.

## D.  The Pleadings

In addition to First Amendment retaliation claims, the Complaint includes several state law claims.[10]  In their Answer, Defendants raised the following purported Affirmative Defenses: (1) failure to state a claim; (2) failure to exhaust administrative remedies; (3) existence of a legitimate penological goal; (4) qualified immunity; (5) lack of personal participation; and (6) lack of supplemental jurisdiction over state law claims.

---

[10] Entler argues on appeal, for the first time, that his Complaint implicitly includes a Free Exercise Clause claim.  Since the issue was neither raised before nor decided by the district court, we will not, in the exercise of our discretion, address it on appeal.  *See United States v. Flores-Montano*, 424 F.3d 1044, 1047 (9th Cir. 2005) ("[I]ssues not raised to the district court normally are deemed waived . . . .").

**II**

Defendants moved for judgment on the pleadings under Rule 12(c).  Initially, the district court summarily adopted Magistrate Judge Hutton's Report and Recommendation ("R&R") recommending that Defendants' 12(c)  motion be granted and that the complaint be dismissed with prejudice. In the R&R, the magistrate judge held that the filing of informal complaints is protected by the First Amendment as part of the "grievance process," but nonetheless concluded that Entler's constitutional claim was not actionable because Defendants had a legitimate penological interest in punishing him for the "threats and coercion" contained in his complaints.   The magistrate judge also concluded that, regardless, Defendants were entitled to qualified immunity "because Entler's rights were not clearly established at the time he was sanctioned."

Entler sought reconsideration.   In a written decision denying the motion, the district court, disagreeing with the magistrate judge, held that Entler's informal complaints were not protected by the First Amendment because they "were not part of the grievance process"; but the court agreed that there was a "rational connection" in the "particular context" of the case with the correctional institution's "legitimate penological interest," namely the "peaceable operation of the prison through the insistence on respect."  *Bradley v. Hall*, 64 F.3d 1276, 1281 (9th Cir. 1995), *overruled on other grounds by Shaw v. Murphy*, 532 U.S. 223, 230 n.2 (2001). The court also agreed with the R&R that, in any event, "defendants are entitled to qualified immunity."

This appeal followed.

## III

We review both the grant of a Rule 12(c) motion and the grant of qualified immunity de novo. *See Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009) (grant of 12(c) motion); *Prison Legal News v. Lehman*, 397 F.3d 692, 698 (9th Cir. 2005) (grant of qualified immunity). A *pro se* complaint must be "liberally construed," since "a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976))*.*

### A.  The Threats to Sue

We are mindful that "[r]unning a prison is an inordinately difficult undertaking," *Mauro v. Arpaio*, 188 F.3d 1054, 1058 (9th Cir. 1999) (en banc) (quoting *Turner v. Safley*, 482 U.S. 78, 84–85 (1987)), and that we should "accord adequate deference to the judgment of the prison authorities," *Lewis v. Casey*, 518 U.S. 343, 361 (1996). We cannot, however, condone punishing a prisoner for simply threatening to sue if his grievances are not addressed.

Regardless of the prisoner's misdeeds—however reprehensible—"[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner*, 482 U.S. at 84. The most fundamental of the constitutional protections that prisoners retain are the First Amendment rights to file prison

grievances[11] and to pursue civil rights litigation in the courts,[12] for "[w]ithout those bedrock constitutional guarantees, inmates would be left with no viable mechanism to remedy prison injustices." *Rhodes v. Robinson*, 408 F.3d 559, 567 (9th Cir. 2005).

The dichotomy that the district court drew between formal and informal grievances has no constitutional underpinning; nor does the distinction between a threat to initiate litigation and the litigation. To the contrary, "[t]he applicability of the constitutional right to redress of grievances does not hinge on the label the prison places on a particular complaint," *Brodheim v. Cry*, 584 F.3d 1262, 127 n.4 (9th Cir. 2009), and embraces threats to sue, *Jones v. Williams*, 791 F.3d 1023, 1035–36 (9th Cir. 2015). Thus, in *Jones*, where the prisoner was sanctioned for verbally confronting the Penitentiary's Assistant Food Services Manager in the prison's kitchen "with complaints of discrimination and a threat to sue," we held that summary judgment dismissing plaintiff's retaliation

---

[11] *See Turner*, 482 U.S. at 84 ("[P]risoners retain the constitutional right to petition the government for the redress of grievances . . . ."); *see also Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009) ("It is well-established that, among the rights they retain, prisoners have a First Amendment right to file prison grievances . . . ."); *Bruce v. Ylst*, 351 F.3d 1283, 1288 (9th Cir. 2003) ("[A] chilling effect on a prisoner's First Amendment right to file prison grievances is sufficient to raise a retaliation claim.").

[12] *See Wolff v. McDonnell*, 418 U.S. 539, 555–56 (1974) ("[Prisoners] retain right of access to the courts."); *see also Hudson v. McMillian*, 503 U.S. 1, 15 (1992) ("[T]he [prisoner's] right to file a court action stands . . . as his most fundamental political right, because preservative of all rights.'" (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886))); *Bounds v. Smith*, 430 U.S. 817, 821 (1977) ("It is now established beyond doubt that prisoners have a constitutional right of access to the courts.").

claim was improper because "Jones's [verbal] complaints of discrimination to his supervisors and statements of intention to file suit were conduct protected by the First Amendment." *Id.*

The district court should have recognized, therefore, that the form of the complaints—even if verbal, let alone, as here, written—is of no constitutional significance, and that threats to sue fall within the purview of the constitutionally protected right to file grievances. *See Hargis v. Foster*, 312 F.3d 404, 411 (9th Cir. 2002) (reversing summary judgment on a prisoner's First Amendment claim because "a jury could reasonably conclude that the prison officials acted unreasonably in characterizing [a prisoner's verbal threat to sue] as an attempt to coerce . . .").[13]

The district court's misunderstanding of these basic tenets of First Amendment jurisprudence was compounded by its incorrect conclusion that dismissal was warranted because the informal complaints "were not part of the 'grievance process.'" However, Entler did exactly what he was "expected" to do by the DOC Grievance Program Manual: he sought "informal resolution" of his concerns "through regular administrative channels prior to utilizing the grievance machinery" by submitting "kites" to the appropriate prison officials. This is as it should be. Entler gave the prison administration the opportunity in the first instance to attempt

---

[13] Another district court in our circuit has correctly recognized, therefore, that the form of the grievance is of no constitutional moment. *See Merrick v. Ellis*, 2015 WL 9999194, at *6 (C.D. Cal. Nov. 30, 2015) ("So Ellis's contention relies solely on the distinction between an oral grievance and a written one. The First Amendment facially makes no such distinction.").

to resolve his concerns and thus obviate the need to engage in the formal grievance process—with its attendant administrative burdens and costs —and litigation.

Indeed, it may well be that if the prison officials were able to address Entler's concerns rather than to punish him for his threats to sue, this litigation might never have come to pass. It would have been a good thing. In 2012, the year Entler initiated this suit, prisoners nationwide filed 54,402 of the 267,990 civil cases brought in the district courts.[14] In 2016, the most recent year with complete statistics, these filings had increased to 76,417 out of 292,159.[15] Thus, over 25% of the district courts' civil caseload in our country entails prisoner litigation.[16]

---

[14] Admin. Office of the U.S. Courts, Judicial Business of the U.S. Courts: 2012 Annual Report of the Director Table C-2 (2012), http://www.uscourts.gov/statistics/table/c-2/statistical-tables-federal-judiciary/2012/12/31.

[15] Admin. Office of the U.S. Courts, Judicial Business of the U.S. Courts: Table C-2 – U.S. District Courts – Civil Statistics Table for the Federal Judiciary (December 31, 2016), http://www.uscourts.gov/statistics/table/c-2/statistical-tables-federal-judiciary/2016/12/31.

[16] In all probability, in Entler's case, this would not have lessened this burden since, while a prisoner at WSP, he had filed fifteen different civil rights cases before the present one. Presumably, a prison rule could be enacted to address administrative burdens flowing from frequent, frivolous kites. *See, e.g.*, 28 U.S.C. 1915(g) (dealing with the "frequent filer" prisoner litigator). But we are not dealing with that concern here since the case entails only the application of the coercion/intimidation rule, and Appellees do not contend that the kites were frivolous. *Cf. Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743 (1983) ("[B]aseless litigation is not immunized by the First Amendment right to petition.").

Turning to the analytical structure of Entler's First Amendment retaliation claim, he would be entitled to prevail if: "(1) . . . a state actor took some adverse action against [him] (2) because of (3) [his] protected conduct, and that such action (4) chilled [his] exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes*, 408 F.3d at 567–68 (9th Cir. 2005).

Appellees do not deny that as "state actors" they took adverse action against Entler; nor do they argue that their actions would not have "chilled" the exercise of his entitlement to seek redress for his grievances.[17] But, in addition to incorrectly contending that Entler's informal complaints were not protected conduct, they assert that the application of Rule 663 reasonably advanced a legitimate correctional goal. That would be so if there was a "'valid, rational connection' between the prison regulation and the legitimate [and neutral] governmental interest put forward to justify it." *Shaw v. Murphy*, 532 U.S. 223, 229 (2001) (quoting *Turner*, 482 U.S. at 89) (alterations in the original).

However, Entler's kites simply set forth the bases for his grievances, often in a respectful tone (e.g., twice beseeching the authorities to "[p]lease remove" the contested $200

---

[17] We also held in *Jones* that the sanction imposed—depriving Jones of points toward program incentives—"'would chill *or* silence a person of ordinary firmness' from engaging in such protected activities in the future," *Jones*, 791 F.3d. at 1036 (quoting *Rhodes*, 408 F.3d at 568–69); *see also Rhodes*, 408 F.3d at 567 n.11 (holding "harm that is more than minimal will almost always have a chilling effect.").

charge),[18] and since he had the right to threaten to sue if his grievances were not addressed, the nexus between the application of the rule and the government's stated interest of preventing the coercion or intimidation of prison staff was "so remote as to render the policy['s application] arbitrary or irrational," *Turner*, 482 U.S. at 89–90.

There remains the issue of qualified immunity. Appellees would not be entitled to prevail if the constitutional right violated "was clearly established at the time of the challenged conduct." *City of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1774 (2015). "A clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). "In the Ninth Circuit, we begin our inquiry by looking to binding precedent. If the right is clearly established by decisional authority of the Supreme Court or this Circuit, our inquiry should come to an end." *Boyd v. Benton Cty.*, 374 F.3d 773, 781 (9th Cir. 2004) (citation omitted).

Although there is no Supreme Court case directly on point, there is clear Ninth Circuit precedent.

---

[18] The district court's reliance on *Bradley* in concluding that "peaceable operation of the prison through the insistence on respect" was here a legitimate penological interest is misplaced. *See Bradley v. Hall*, 64 F.3d 1276, 1281–82 (9th Cir. 1995). Appellees rely on coercion, not respect, as the legitimate penological interest. Appellees' Br. at 35 ("[T]he legitimate penological interests served by disrespectful and coercive speech are different."). This was wise, as the court in *Bradley* found *in favor* of the prisoner, holding that a rule banning disrespectful speech was unconstitutional as applied. *Bradley*, 64 F.3d at 1281–82.

First, it was, of course, clearly established when Entler filed his grievances in 2012 that he had the "constitutional right" to do that, *see Turner*, 482 U.S. at 84—a right that did not "hinge on the label" the prison placed on his complaints. *Brodheim*, 584 F.3d at 1271 n.4.[19]  Nor could the prison's officials "escape constitutional scrutiny by citing a legitimate penological interest" in the absence— as here—of a "valid, rational connection" between the adverse action imposed on the prisoner and the government's stated interest.  *Id.* at 1272–73.  And it was also clearly established that Entler had the time-honored right to pursue civil litigation, a right liberally exercised for over forty years. *See* William Bennett Turner, *When Prisoners Sue: A Study of Prisoner Section 1983 Suits in the Federal Courts*, 92 Harv. L. Rev. 610, 610–11 (1979) (recognizing that "[p]risoners, like other people, may sue state and local officials under 42 U.S.C. § 1983, to redress the deprivation of federal constitutional rights" and discussing an "upsurge in volume" of such suits beginning in the 1970s).

It was also beyond cavil that Entler's grievances were the first requisite steps in the pursuit of civil litigation.  *See Porter v. Nussle*, 534 U.S. 516, 524 (2002) ("[E]xhaustion is now required for all action[s] . . . brought with respect to prison conditions, whether under § 1983 or any other Federal law.").  The threat of civil litigation if a prisoner's complaints are not redressed is implicit in every grievance; explicitly articulating that threat as a precursor to initiating civil

---

[19] Moreover, the prison officials were chargeable with knowledge of the contents of the Manual and that Entler was "expected" to comply with its procedural requirements—as he did—in initiating his grievances. *See Anderson v. Smith*, 697 F.2d 239, 240 (8th Cir. 1983) ("An inmate is entitled to expect the Bureau of Prisons to follow its own policies.").

litigation does not suddenly make that threat more intimidating or coercive.

Thus, in the analogous Title VII retaliation context, we noted—twenty years before Entler was punished—that "[w]e see no legal distinction to be made between the filing of a charge which is clearly protected, and threatening to file a charge." *Gifford v. Atchison, Topeka and Santa Fe Ry. Co.*, 685 F.2d 1149, 1156 n.3 (9th Cir. 1982) (citation omitted).

We find the *Gifford* footnote persuasive since we see no material distinction between retaliation in the Title VII context and prisoner retaliation.[20] The sanctity of a constitutional right is at least of equal moment as a statutory right. And even though, in the face of Ninth Circuit precedent, we need not resort to out-of-circuit caselaw, we note with approval two out-of-circuit district court cases involving prisoner litigation.

In *Sprau v. Coughlin*, 997 F. Supp. 390 (W.D.N.Y. 1998), the district court held that "plaintiff's conduct in threatening to file a [prisoner] complaint was protected by the First Amendment's guarantee of the right to petition the

---

[20] The *Gifford* footnote is not mere dicta and is worthy of substantive consideration. As we commented in *Phillips v. Osborne*, 444 F.2d 778, 782–83 (9th Cir. 1971): "We think that the location, whether in the text or in a footnote, of something which the writer of an opinion thinks should be said, is a matter of style which must be left to the writer. A notable example of a footnote of great significance is footnote No. 4 in the opinion of Mr. Justice Stone (later Chief Justice Stone) in *United States v. Carolene Products Co.*, 304 U.S. 114 (1938). See, among the many comments which that footnote has excited, that of Judge Learned Hand, 'Chief Justice Stone's Concept of the Judicial Function' in 'The Spirit of Liberty' (Dillard Ed. 1952) 201, 205."

government for redress of grievance." *Sprau*, 997 F. Supp. at 393.

Similarly, in *Carter v. Dolce*, 647 F. Supp. 2d 826 (E.D. Mich. 2009), the district court held that there was "little difference between retaliating against a [prisoner] for filing a grievance, and retaliating for threatening to file one." *Carter*, 647 F. Supp. 2d at 834. The court cited as analogous two Sixth Circuit decisions, one of which expressly relies on the *Gifford* footnote: In *Jackson v. City of Columbus*, 194 F.3d 737, 756–57 (6th Cir. 1999), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002), the circuit court held that an employee engages in protected activity under the First Amendment when he threatens to file a lawsuit on a matter of public concern, and in *Polk v. Yellow Freight System, Inc.*, 801 F.2d 190 (6th Cir. 1986), the circuit court held that there "'is no legal distinction . . . between the filing of a charge which is clearly protected . . . and threatening to file a charge'" under Title VII's anti-retaliation provision, *Polk*, 801 F.2d at 200 (quoting *Gifford* footnote). The court in *Carter* further recognized that "threatening to resort to the formal grievance process is itself the first step in that process." *Carter*, 647 F. Supp. 2d at 834.

In essence, it is illogical to conclude that prison officials may punish a prisoner for *threatening* to sue when it would be unconstitutional to punish a prisoner for *actually* suing. Thus, once again, as we held in *Hargis*, ten years before Entler was sanctioned, a threat to sue—even if verbal—may

not *ipso facto* rise to the level of coercion to support prison retaliation.**[21]**

Taking the complaint as true in the face of a 12(c) motion to dismiss on the pleadings, *see Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009) ("We must accept all factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party"), we cannot conclude that a reasonable official would not have understood that disciplining Entler for threatening to file a civil suit was constitutionally impermissible. Therefore, on the papers before us, Appellees are not entitled to qualified immunity for Entler's threats to initiate civil litigation.

## B. The Criminal Threat

Included in the mix of infractions that caused Hearing Officer Jackson to sentence Entler to fifteen days of lost "big yard" and gym time was Entler's threat to "file criminal charges/arrest by sheriff." We hold, as a matter of first impression in our circuit, that both the filing of a criminal

---

**[21]** We acknowledge that the Seventh Circuit in *Bridges v. Gilbert*, 557 F.3d 541, 555 (7th Cir. 2009), cryptically stated in dicta, without citation to a single authority, that "it seems implausible that a *threat* to file a grievance would itself constitute a First Amendment-protected grievance." *But see Ashley v. Seamon*, 32 Fed. Appx. 747, 749–50 (7th Cir. 2002) (holding prisoner's threat to sue was protected conduct). Even if it were Ninth Circuit dicta, we would not be bound to follow it. *See, e.g.*, *Cent. Virginia Cmty. Coll. v. Katz*, 546 U.S. 356, 363 (2006) ("[W]e are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated."). In any event, even in the absence of Ninth Circuit precedent, "lack of complete unanimity [of out-of-circuit courts] does not mean that a legal principle has not been clearly established," *Inouye v. Kemma*, 504 F.3d 705, 717 (9th Cir. 2007), and "available near-unanimous" case law would suffice. *Id.*

complaint by a prisoner, as well as the threat to do so, are protected by the First Amendment, provided they are not baseless. *See Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743 (1983).**[22]**

Although we have not had occasion to opine on the foundational constitutional principle, we join our two sister circuits that have held that the filing of criminal complaints falls within the embrace of the First Amendment. *See Meyer v. Bd. of Cty. Comm'rs*, 482 F.3d 1232, 1243 (10th Cir. 2007) ("[F]iling a criminal complaint with law enforcement officials constitutes an exercise of the First Amendment right to petition the government for the redress of grievances."); *United States v. Hylton*, 710 F.2d 1106, 1111 (5th Cir. 1983) (filing of a "nonfraudulent criminal complaint against federal agents" represented "a legitimate and protected exercise of [plaintiff's] right to petition for the redress of grievances").**[23]** As the court in *Meyer* aptly stated:

> [T]his case involves the right to present a criminal complaint which is a form of the right to petition for redress of grievances, and thus one of the most basic of all constitutional rights. In a non-precedential but persuasive

---

**[22]** Appellees appropriately do not argue that the complaint was baseless. Indeed, it elaborately sets forth a number of penal statutes that are implicated when a public official allegedly is guilty of misconduct in the discharge of his duties.

**[23]** Although we need not consider whether Entler was also punished for filing his criminal complaint, since this contention is unsupported in the record, we nonetheless must decide that filing a criminal complaint is protected conduct before reaching the question of whether threatening to file the complaint would also be protected conduct.

opinion from one of our district courts addressing a closely analogous situation, the district judge said: While Plaintiff did not have a right to force the local prosecutor to *pursue* her charges, she possessed the right to access judicial procedures for redress of her claimed wrongs and to set in motion the governmental machinery.

482 F.3d at 1243 n.5; *see also Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) (holding "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another").

It matters not who files the criminal complaint or who the complaint is against. Thus, there is no constitutional distinction to be drawn between the filing of a criminal complaint against a private individual, as in *Meyer*,[24] and the filing of a criminal complaint against a public official, as in *Hylton*.[25] Nor does it matter that a prisoner files the criminal complaint. *See, e.g.*, *Hayes v. Walsh*, 2012 WL 2462307, at *9 (M.D. Pa. May 14, 2012), *adopted in relevant part by Hayes v. Walsh*, 2012 WL 2462316 (M.D. Pa. June 27, 2012) (improper to retaliate against prisoner for filing criminal

---

[24] *See also Jones v. Pore*, 2007 WL 1875653, at *1–2, 4 (D. Or. June 26, 2007) (complaint against ex-wife); *Jackson v. New York*, 381 F. Supp. 2d 80, 89 (N.D.N.Y. 2005) (complaint against neighbors); *Lott v. Andrews Ctr.*, 259 F. Supp. 2d 564, 567–68 (E.D. Tex. 2003) (complaint against co-worker).

[25] *See also Low v. City of Sacramento*, 2010 WL 3714993, at *2, 5–6 (E.D. Cal. Sept. 17, 2010) (complaint against police officer); *Estate of Morris v. Dapolito*, 297 F. Supp. 2d 680, 683, 692–93 (S.D.N.Y. 2005) (complaint against gym teacher).

complaint against prison guard); *Cannon v. Dean Newport*, 2016 WL 1045540, at \*4 (E.D. Wis. Mar. 15, 2016) (same, in respect to criminal complaint against police officer); *Horan v. Wetzel*, 2014 WL 2442868, at \*4 (Pa. Commw. Ct., May 28, 2014) (same, in respect to criminal complaint against prison staff).

It logically follows, therefore, just as with threats to file civil litigation, that the right to petition for the redress of grievances applies with equal force to threats to file criminal complaints. Therefore, the threat by a prisoner to file a criminal complaint, as well as the filing of the complaint, are both constitutionally protected conduct.

Nor could there be a valid penological interest in punishing Entler for his criminal threat. There is even less of a nexus between the prison's coercion/intimidation regulation and a legitimate government interest than in the civil context. All Entler could do was *request* that criminal charges be brought, whereas he had the absolute right to *initiate* civil litigation.

This leaves the question of qualified immunity. Although we hold that Entler's threat to file his criminal complaint was a constitutionally protected right, we are not convinced that at the time of the threat "any reasonable official in [Appellees'] shoes would have understood that [they were] violating it, meaning that existing precedent . . . placed the . . . constitutional question beyond debate." *Sheehan*, 135 S. Ct. at 1774 (citation omitted).

While it is true that where, as here, there is no binding Ninth Circuit precedent, we may "look to whatever decisional law is available, including relevant decisions of other circuits,

state courts, and district courts," *Moonin v. Tice*, 868 F.3d 853, 868 (9th Cir. 2017) (quoting *Tarabochia v. Adkins*, 766 F.3d 1115, 1125 (9th Cir. 2014)), neither *Meyer*, *Hylton*, nor the three out-of-circuit prisoner cases hold that the *threat* to file a criminal complaint is constitutionally protected conduct.[26]  Unlike the threat to sue, therefore, there is neither Ninth Circuit precedent nor out-of-circuit authority addressing that issue, let alone a "robust consensus of cases of persuasive authority." *Sheehan*, 135 S. Ct. at 1778 (citation omitted).[27]

## CONCLUSION

Since Entler has alleged cognizable First Amendment retaliation claims regarding his threats to sue, and qualified immunity does not attach, it was improper to dismiss the complaint in its entirety under Rule 12(c).  However, in regard to Entler's threat to file a criminal complaint, even

---

[26] Moreover, of the three cases recognizing a prisoner's constitutional right to file criminal complaints, one was decided just a few months before Entler's threat, *see Hayes*, 2012 WL 2462307 (decided in May 2012), and the others some years later, *see Cannon*, 2016 WL 1045540 (decided in March 2016); *Horan*, 2014 WL 2442868 (decided in May 2014).

[27] Since the record does not support Entler's claim that he was retaliated against for filing a criminal complaint, we need not address whether qualified immunity would there attach.

though it is a constitutionally protected right, qualified immunity attaches; hence, dismissal of that aspect of the complaint was proper.[28]

**REVERSED in part, AFFIRMED in part, and REMANDED.**

---

[28] We note that the threat to file a criminal complaint was one of the reasons—together with Entler's threats to sue regarding the $200 charge on his prison account and the denial of his application for an art curio permit—for the hearing officer's sentence of fifteen days of lost "big yard" and gym time. The district court may have to resolve as a factual matter whether Entler would nonetheless have been sanctioned for his threats to sue in the absence of this threat.